**SPRAY–RITE SERVICE CORPORATION, an Iowa corporation, Plaintiff-Appellee,**

v.

**MONSANTO COMPANY, a Delaware Corporation, Defendant-Appellant.**

**Nos. 80–1621, 80–2232, 80–2233 and 80–2624.**

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1981.

Decided June 28, 1982.

Rehearing and Rehearing En Banc Denied Sept. 8, 1982.

James I. Rubin, Butler & Rubin, Ltd., Robert G. Foster, Winston & Strawn, Chicago, Ill., for plaintiff-appellee/cross-appellant.

Fred H. Bartlit, Jr., Kirkland & Ellis, Chicago, Ill., for defendant-appellant/cross-appellee.

Before BAUER, Circuit Judge, NICHOLS, Associate Judge,[*] and WOOD, Circuit Judge.

BAUER, Circuit Judge.

Spray-Rite Service Corporation ("Spray-Rite") brought this antitrust action against Monsanto Company alleging that Monsanto combined and conspired with some of its distributors to fix the resale price of Monsanto herbicides in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Spray-Rite's cause of action was tried to a jury before the Honorable Stanley J. Roszkowski. On February 21, 1980, the jury returned a verdict against Monsanto and awarded Spray-Rite $3,500,000. The district court trebled the verdict pursuant to 15 U.S.C. § 15. The Clerk of the District Court entered judgment the following day of "$10,500,000.00 plus interest at the legal rate." On March 11, 1980, Spray-Rite moved to amend the judgment to assess costs and attorneys' fees. The court granted Spray-Rite's motion on March 21, 1980.

The four separate appeals from the judgment below have been consolidated in this court. Monsanto appeals in 80–1621 from the order granting Spray-Rite's motion to amend the judgment to assess costs and attorneys' fees, and it appeals in 80–2232 from the verdict against it. Monsanto appeals in 80–2624 from the order awarding Spray-Rite $895.747.80 in attorneys' fees. Spray-Rite cross-appeals in 80–2233 from the original judgment to the extent that it failed to assess costs and attorneys' fees. We affirm the amended judgment against Monsanto, dismiss Spray-Rite's cross-appeal, and affirm in part and reverse and remand in part the award of $895,747.80 in attorneys' fees.

## FACTS

Spray-Rite was engaged in the wholesale agricultural chemical distribution business from 1957 to 1972. Donald Yapp, Spray-Rite's owner and president, was the company's sole salaried salesman. Spray-Rite bought insecticides and herbicides from competing manufacturers, including Monsanto, and resold products to dealers and farmers.

Between 1957 and 1968, Monsanto manufactured two herbicides: Randox and Ramrod; it introduced a third product, Lasso, in 1968. Monsanto markets its herbicides primarily through independent, non-exclusive distributors. Monsanto assigns each distributor a geographic area of primary responsibility, but the distributors may sell outside that area. Approximately ten to twenty distributors are assigned to each area.

Monsanto sent a letter to each of its distributors in 1967 announcing that it would immediately appoint distributors for one year terms expiring automatically unless renewed by Monsanto. The letter described Monsanto's newly adopted criteria for evaluating distributor performance: (1) whether the distributor's primary activity was soliciting sales to herbicide dealers; (2) whether the distributor employed trained personnel capable of carrying out Monsanto's technical programs with dealers and farmers;[1] and (3) whether the distributor was fully exploiting the herbicide market in its area of primary responsibility. Yapp received the letter describing the evaluation criteria along with his one-year distributorship contract for 1967–68.

Monsanto notified Spray-Rite in 1968 that it would not renew Spray-Rite's distributorship. Of Monsanto's approximately 100 distributors, Spray-Rite was its tenth largest Ramrod distributor. Ninety percent of Spray-Rite's sales volume was devoted to herbicide sales, 16% of its sales were of

---

[*] The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation.

1. Monsanto's technical programs consist of instructing dealers and farmers on herbicide usage and effectiveness. Monsanto expects its distributors to provide salesmen to staff these programs.

Monsanto products, and 18% of its profits were derived from its Monsanto sales during the 1967–68 season.

Monsanto made several changes in its herbicide business after the 1967–68 season. In addition to introducing Lasso, Monsanto reduced the distributor and suggested resale prices of Ramrod and changed the suggested distributor profit margin from 11% to approximately 7%. Monsanto also adopted new shipping and pick-up policies. It made free deliveries to the Monsanto warehouse within the distributor's area of primary responsibility, but the distributor had to assume the additional shipping costs if it resold the products outside its primary area. Monsanto's new compensation programs included cash bonus payments to distributors for participating in Monsanto's technical schools and demonstrations. Monsanto expanded the compensation programs in 1970 and 1972 to include distributor price discounts on herbicides resold to dealers who had attended Monsanto's technical programs. Monsanto also gave price discounts, which were rebated to the distributor at the end of the season, on orders purchased early in the season.

Spray-Rite attempted to purchase Monsanto herbicides from other distributors after its distributorship was terminated.[2] It was unable to purchase any Lasso at all during the 1968–69 season. It did obtain some Ramrod, but not so much as it desired or so early in the season as it needed. Spray-Rite went out of business in 1972. It contends that Monsanto's unlawful business practices drove it out of business.

Spray-Rite claims that Monsanto and some of its distributors conspired to fix the resale price of Monsanto herbicides. Spray-Rite contends that Monsanto terminated Spray-Rite's distributorship, adopted compensation programs and shipping policies, and encouraged distributors to boycott Spray-Rite in furtherance of this conspiracy.

The district court instructed the jury that it should find Monsanto's conduct per se unlawful if it found that Monsanto engaged in the alleged conduct in furtherance of a conspiracy to fix resale prices. The court also gave the jury three special interrogatories.

1. Was the decision by Monsanto not to offer a new contract to plaintiff for 1969 made by Monsanto pursuant to a conspiracy or combination with one or more of its distributors to fix, maintain or stabilize resale prices of Monsanto herbicides?

2. Were the compensation programs and/or areas of primary responsibility, and/or shipping policy created by Monsanto pursuant to a conspiracy to fix, maintain or stabilize resale prices on Monsanto herbicides?

3. Did Monsanto conspire or combine with one or more of its distributors so that one or more of those distributors would limit plaintiff's access to Monsanto herbicides after 1968?

The jury responded "yes" to each interrogatory and returned a general verdict against Monsanto awarding Spray-Rite $3,500,000 in damages.

No. 80–2232: Monsanto's appeal from the verdict.

Monsanto argues three separate grounds for reversal. First, it asserts that the jury charge contained material misstatements of the law governing the issues in this case. Second, Monsanto contends that there is insufficient evidence to support the verdict. Third, Monsanto argues that the district court made several erroneous evidentiary rulings. We find none of Monsanto's arguments persuasive, and, accordingly, we affirm the judgment of the district court.

I. *The Jury Charge*

■ We must consider alleged errors in jury instructions in light of the adequacy of

---

**2.** Monsanto did not terminate the Spray-Rite distributorship; it simply refused to renew the distributorship when the 1967 contract expired. For purposes of our discussion, however, we

will use "refused to renew" and "terminated" interchangeably. *See Yentsch v. Texaco, Inc.,* 630 F.2d 46 (2d Cir. 1980).

the charge as a whole. *Alloy International Co. v. Hoover-NSK Bearing Co.*, 635 F.2d 1222, 1226 (7th Cir. 1980). The district court instructed the jury generally concerning Spray-Rite's theory of the case. It also instructed the jury that Spray-Rite bore the burden of proof, including the burden of proving the existence of a conspiracy to fix the resale price of Monsanto herbicides. The instructions defined "conspiracy" and explained that some types of restraints are per se unlawful. The court then instructed the jury concerning termination of distributorships, boycotts, and the use of vertical restrictions. After carefully reviewing the entire jury charge, we are convinced that the instructions in this case were proper.

### A. Termination of the Spray-Rite Distributorship

The court instructed the jury that a manufacturer has the right to select its distributors and set a suggested resale price for its products. The instructions explained that this right is limited, however, because the manufacturer may not coerce distributors to follow its suggested price by threatening to terminate their distributorships. The court then instructed the jury that "[i]f the manufacturer's selection [of a distributor] is accompanied by unlawful *purpose*, conduct or agreement, it violates the Sherman Act." Tr. at 4363 (emphasis added). Monsanto contends that these instructions gave the jury the incorrect impression that a manufacturer that unilaterally decides to terminate a distributor violates the Sherman Act if the manufacturer had an improper motive.

A manufacturer may unilaterally fix a suggested resale price for its product. *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). It may also lawfully refuse to deal with any distributor that resells the product at a price other than that it has suggested. *Id.* If, however, the manufacturer does anything more than merely announce the suggested resale price and then refuse to deal with distributors that fail to comply with that price, the manufacturer is engaged in a per se unlaw-

ful resale price maintenance scheme. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *FTC v. Beech-Nut Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922). An unlawful resale price maintenance scheme can be effected in either of two ways: the manufacturer and its distributors may enter into an express or implied agreement to maintain a fixed resale price, *United States v. Bausch & Lomb Co.*, 321 U.S. 707, 721, 64 S.Ct. 805, 812, 88 L.Ed. 1024 (1944), or the manufacturer may secure adherence to its suggested resale price through coercion, including threats to terminate distributors if they do not follow the suggested price. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). The manufacturer may not terminate a distributor if (1) the termination is at the request of a competing distributor *and* (2) the termination is motivated by a desire to reduce or eliminate price competition for the manufacturer's products. *Contractor Utility Sales Co., Inc. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1072 & n.9 (7th Cir. 1981); *Alloy International Co. v. Hoover-NSK Bearing Co., Inc.*, 635 F.2d 1222, 1225–26 (7th Cir. 1980). *See also Battle v. Lubrizol Corp.*, 673 F.2d 984, 992 (8th Cir. 1982); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 169–70 (3d Cir. 1979).

We agree with Monsanto that the jury should not have been instructed that a manufacturer's unilateral decision to terminate a distributor is unlawful if based on an improper motive. A manufacturer's unilateral termination of a distributor is not unlawful regardless of whether it is motivated by an illegal purpose. *United States v. Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). We believe, however, that this one inaccuracy was harmless. The entire jury charge informed the jury that Spray-Rite had to prove the existence of an agreement, conspiracy, or combination and that Monsanto's termination of Spray-Rite was

unlawful only if the decision to terminate was not unilateral.[3] The entire charge correctly instructed the jury that Spray-Rite had to adduce evidence of an illegal purpose *and* an unlawful combination, conspiracy, or agreement to prove that Monsanto's refusal to renew the Spray-Rite distributorship was unlawful.[4]

### B. *Post-Termination Boycott of Spray-Rite*

Monsanto contends that the court's boycott instructions were erroneous. The court instructed the jury that a group boycott is per se unlawful and that it should find that Monsanto violated section 1 of the Sherman Act if it found that Monsanto agreed with some of its distributors to terminate Spray-Rite's distributorship or limit Spray-Rite's access to Monsanto products. Monsanto argues that only horizontal combinations to boycott are subject to the per se rule and that vertically imposed boycotts are subject to rule of reason analysis. Monsanto contends that the per se instruction should not have been given because Spray-Rite only introduced evidence of a *vertical* agreement between Monsanto and its distributors.

3. The court gave the following instructions concerning Spray-Rite's claim that Monsanto unlawfully terminated the Spray-Rite distributorship:

> The fact that distributors complain about prices or anything else does not in itself mean that a conspiracy existed. Even if you find that Monsanto acted in exactly the way that complainants would have wished, that does not prove the existence of a conspiracy; it would, however, be evidence that you can take into consideration in deciding whether or not a conspiracy existed.
>
> \* \* \* \* \* \*
>
> It is also unlawful for a manufacturer to terminate or threaten to terminate one of its distributors for the reason that the distributor objected to, or departed from either the manufacturer's price-fixing or stabilization plan or any customer or territorial restraints which are part of that plan. Therefore, if you find that termination or threat of termination was utilized by the defendant as a coercive tool against the plaintiff or any other distributor of defendant to force adherence to any aspect of a resale price maintenance plan, such termination or threat of termination is unlawful. It does not matter whether the defendant initiated the coercion, or whether it was done in response to pressure or complaints from one or more of its distributors.
>
> A termination or threat of termination to compel adherence to any aspect of a resale price maintenance plan is unlawful, whether or not there was any reasonable justification.
>
> \* \* \* \* \* \*
>
> The law recognizes a limited right in the manufacturer to select its distributors, but that right is neither absolute nor exempt from regulation. If the manufacturer's selection is accompanied by unlawful purpose, conduct or agreement, it violates the Sherman Act.
>
> A manufacturer may announce suggested resale prices and refuse to sell to a distributor which refuses to abide by those suggested prices. However, the manufacturer's conduct must be totally independent. In deciding whether the manufacturer's conduct was completely independent and unilateral, you should look to what the participants did, rather than the words they used.
>
> Therefore, the defendant's limited right to choose its distributors does not include the right to, in any way, conspire or combine with one or more of its distributors to fix or stabilize resale prices, or to refuse to deal, or to commit any other act which has been described in these instructions as a per se violation of the antitrust laws.
>
> \* \* \* \* \* \*
>
> The defendant has a right to select distributors that it thinks will do the best job for it provided that in doing so the defendant's decision not to renew the plaintiff's contract was not made pursuant to a price-fixing conspiracy or combination.

Tr. at 4354, 4356–57, 4363, 4364.

4. Monsanto further claims that the instructions were incomplete because the district court refused to give an instruction Monsanto tendered. The court did not err in refusing to give Monsanto's tendered instruction because the instruction is erroneous. Monsanto requested that the court instruct the jury that:

> As long as its decision not to renew plaintiff's distributorship was not made pursuant to a conspiracy or combination to fix prices, defendant even had the right to agree with other distributors not to renew plaintiff's contract.

Tr. at 4206. Monsanto, however, could not lawfully terminate Spray-Rite's distributorship pursuant to an agreement with its distributors because such conduct is a concerted refusal to deal which is per se unlawful even if not part of a scheme to fix resale prices. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Certain types of group boycotts are among the practices that the Supreme Court has deemed to be per se unlawful. *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Not all boycotts, however, are per se unlawful. *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781 (7th Cir. 1981); *Smith v. Pro Football, Inc.*, 593 F.2d 1173 (D.C.Cir. 1978); *Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646 (5th Cir. 1977); *Mackey v. NFL*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Deesen v. Professional Golfers' Ass'n*, 358 F.2d 165 (9th Cir.), *cert. denied*, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966), *reh. denied*, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967). A per se unlawful boycott has two essential elements: (1) at least some of the boycotters are competitors of each other and the target and (2) the boycott is designed to protect the boycotters from competition with the target. *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981).

Spray-Rite claims that Monsanto and some of its distributors agreed to boycott it. This is precisely the type of group boycott that the Supreme Court held per se unlawful in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), and *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In *Klor's*, a manufacturer and several retail stores agreed to boycott a retail store that competed with some of the boycotters. In *General Motors Corp.*, General Motors agreed with some of its dealers to boycott other dealers selling GM automobiles at reduced prices. In this case, according to Spray-Rite, Monsanto, like General Motors, agreed with some of its distributors to boycott Spray-Rite, a competing distributor. Spray-Rite's theory, if supported by the evidence, presents a "classic" group boycott in which there is " 'a concerted attempt by a group of competitors at one level to protect itself from competition from non-group members who seek to compete at that level.' " *United States Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981), *quoting Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C.Cir.1978). The district court did not err in giving a per se boycott instruction.

The district court instructed the jury that it could consider Monsanto's compensation programs as evidence of Monsanto's conspiracy to boycott Spray-Rite.[5] Monsanto claims that this instruction is erroneous because it suggests that the jury could find a conspiracy to boycott Spray-Rite if it found (1) that Monsanto's territorial policies and compensation programs had an adverse effect on Spray-Rite and (2) that other distributors participated in the programs.

Monsanto has taken this instruction out of the context of the entire jury charge. The court instructed the jury that it could find a conspiracy only if it found that Monsanto and some of its distributors agreed to boycott Spray-Rite. The jury was instructed that "[m]ere similarity of conduct among various persons ... does not necessarily establish proof of the existence of a conspiracy." Tr. at 4351. The entire jury charge properly instructed the jury concerning the elements of a conspiracy to boycott. The court did not err in instructing the jury that it could consider the effect of Monsanto's compensation programs as circumstantial evidence of the conspiracy to boycott.

### C. *Monsanto's Compensation Programs and Shipping Policies*

Finally, Monsanto contends that the instructions concerning Monsanto's compensa-

---

**5.** The instruction stated:

The fact that some of Monsanto's policies may have affected the price paid by all non-contract sellers, including plaintiff, does not necessarily establish a conspiracy, but may be evidence which you can consider along with all the other evidence in the case in deciding whether a conspiracy existed.
Tr. at 4365.

tion programs and shipping policies were erroneous. The court instructed the jury that it is per se unlawful for a manufacturer to utilize customer or territorial restrictions as part of a comprehensive price-fixing plan or boycott. Monsanto claims that the court should have instructed the jury to determine the lawfulness of its compensation programs and shipping policies pursuant to the rule of reason rather than the per se rule. Monsanto's reliance on *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), in support of its argument, however, is misplaced.

In *Continental T.V.*, the Supreme Court held that the rule of reason, rather than the per se rule, applies in cases involving nonprice vertical location restrictions. 433 U.S. at 41 n.9, 97 S.Ct. at 2553 n.9. The Court held that the interbrand competition stimulated by the restrictions may outweigh the negative effects the restrictions have on intrabrand competition. Nothing in the Court's opinion, however, implies that it intended to limit *United States v. Sealy*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), in which it held that otherwise lawful vertical restrictions imposed as part of an unlawful scheme to fix prices are per se unlawful. In *Sealy*, the Government argued that Sealy's policy of restricting its licensees to a single manufacturing and resale area was part of a per se unlawful market allocation and price-fixing scheme. Sealy responded that the restriction was a mere incident to its lawful trademark licensing. The Court rejected Sealy's contention and held that the manufacturing and resale restrictions were unlawful because they were part of a per se unlawful price-fixing scheme. "The territorial restraints were a part of the unlawful price-fixing and policing .... [I]ts connection with the unlawful price-fixing is enough to require that it be condemned as an unlawful restraint." *Id.* at 356–57, 87 S.Ct. at 1852.

*United States v. Sealy* rather than *Continental T.V.* governs this case. *Continental T.V.* applies only if there is no allegation that the territorial restrictions are part of a conspiracy to fix prices. 433 U.S. at 41 n.9 & 51 n.18, 97 S.Ct. at 2553 n.9 & 2558 n.18. Spray-Rite contended, and the jury was instructed, that Monsanto's vertical nonprice restrictions were part of an unlawful scheme to fix prices. Thus, *Sealy* and its progeny prescribe the per se rule.

■ The instruction about which Monsanto complains is similar to an instruction we approved in *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 827 (7th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), *later appeal*, 669 F.2d 490 (7th Cir. 1982). Sealy's licensing agreement included a right-of-first-refusal clause granting Sealy the right to buy a franchise if it were put on the market and a clause requiring licensees to pay special charges to Sealy for any sales made outside a licensee's area of primary responsibility. Ohio-Sealy conceded that these contract terms were lawful in themselves but claimed that they were part of an illegal horizontal scheme to allocate markets and, thus, were per se illegal. The jury was so instructed, and we affirmed. *Accord, Mishawaka, Indiana v. American Electric Power Co., Inc.*, 616 F.2d 976, 986 (7th Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 892, 66 L.Ed.2d 824 *reh. denied*, 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981). In this case, the court instructed the jury that Monsanto's otherwise lawful compensation programs and shipping policies were per se unlawful if undertaken as part of an illegal scheme to fix prices. We find, as we did in *Ohio-Sealy*, that this instruction is accurate. "In any price-fixing case restrictive practices ancillary to the price-fixing scheme are also quite properly restrained." *White Motor Co. v. United States*, 372 U.S. 253, 260, 83 S.Ct. 696, 700, 9 L.Ed.2d 738 (1963) (citation omitted). *Accord, United States v. General Motors Corp.*, 384 U.S. 127, 142, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966).[6]

---

**6.** Monsanto's reliance on *Cowley v. Braden Industries, Inc.*, 613 F.2d 751 (9th Cir.), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d

824 (1980), *General Beverage Sales Co. v. East-Side Winery*, 568 F.2d 1147 (7th Cir. 1978), and *FLM Collision Parts, Inc. v. Ford Motor Co.,*

## II. *Sufficiency of the Evidence*

Monsanto contends that the evidence is insufficient to support the verdict. Monsanto initially claims that Spray-Rite failed to prove that Monsanto terminated Spray-Rite's distributorship as part of a conspiracy to fix resale prices or that Monsanto combined with its distributors to boycott Spray-Rite. Monsanto argues in the alternative that even if Spray-Rite proved liability, it failed to prove the nature and extent of any actual damages caused by Monsanto's unlawful business practices.

 In reviewing the trial court, we must weigh conflicting evidence and inferences most favorably to the prevailing party. *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 479 (7th Cir. 1980). If there is any substantial evidence in the record to support the jury's verdict, we must affirm the judgment. *Fontana Aviation, Inc. v. Beech Aircraft Corp.*, 432 F.2d 1080, 1084 (7th Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971).

### A. *Termination of the Spray-Rite Distributorship*

Monsanto claims that Spray-Rite failed to prove that Monsanto terminated the Spray-Rite distributorship pursuant to a conspiracy to fix the resale price of Monsanto herbicides. Monsanto contends that Spray-Rite had to prove either (1) that Monsanto agreed with Spray-Rite's competitors to terminate Spray-Rite in order to fix the resale price of Monsanto herbicides, *Contractor Utility Sales Co., Inc. v. Certain-Teed Products Corp.*, 638 F.2d 1061 (7th Cir. 1981), or (2) that Monsanto fixed resale prices of its herbicides by coercing distributors to adhere to its suggested prices. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Monsanto contends that Spray-Rite failed to sustain its

burden of proof on either of these two theories. First, Monsanto claims that Spray-Rite failed to prove the existence of an agreement between Monsanto and some of its distributors to terminate Spray-Rite. Spray-Rite was only able to show that Monsanto was concerned about the resale price of its herbicides and that it received some price complaints about Spray-Rite from other distributors. Moreover, Monsanto argues that it proved that it had valid business reasons for terminating Spray-Rite. Second, Monsanto contends that Spray-Rite failed to prove that Monsanto fixed the resale price of its herbicides by coercing distributors to adhere to Monsanto's suggested resale prices. Monsanto argues that the evidence showed that Monsanto's distributors failed to adhere to the suggested prices and, consequently, there was extensive intrabrand price competition.

Monsanto argues that evidence of price complaints coupled with evidence of termination in response to those complaints is insufficient to prove the existence of a resale price maintenance agreement. It relies on *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 110 (3d Cir. 1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), in which the Third Circuit held that proof of competitor complaints followed by termination is insufficient to create an inference of concerted action.

 We believe, however, that proof of termination following competitor complaints is sufficient to support an inference of concerted action. In *Battle v. Lubrizol Corp.*, 673 F.2d 984 (8th Cir. 1982), the Eighth Circuit declined to follow *Sweeney* and held "that proof of a dealer's complaints to the manufacturer about a competitor dealer's price cutting and the manufacturer's action *in response* to such com-

543 F.2d 1019 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977), is misplaced. Both *Cowley* and *General Beverage* are inapposite because the plaintiffs in those cases failed to allege that the distributors' territorial restrictions were ancillary to per se unlawful price-fixing schemes. *FLM*

*Collision Parts, Inc.* is inapplicable because the Ninth Circuit found that the plaintiff had failed to prove the existence of a price-fixing conspiracy. Therefore, the rule of reason rather than the per se rule applied in those cases, which involved non-price, vertical restraints.

plaints would be sufficient to raise an inference of concerted action." *Id.* at 991 (emphasis in original).[7] We agree. Proof of distributorship termination in response to competing distributors' complaints about the terminated distributor's pricing policies is sufficient to raise an inference of concerted action. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742 at 743 (7th Cir. 1982). *See also Alloy International Co. v. Hoover-NSK Bearing Co.,* 635 F.2d 1222 (7th Cir. 1980) (a terminated distributor presents sufficient evidence to support a verdict in its favor by proving (1) that the manufacturer received price complaints from the distributor's competitors, (2) that the manufacturer was concerned about raising its wholesale price and recognized that its ability to do so might be influenced by the distributor's prices, and (3) that the manufacturer terminated the distributorship).

Spray-Rite satisfied this burden of proof. Thomas Dille, a former Monsanto District Manager for Spray-Rite's area of primary responsibility, testified that he received numerous complaints about Spray-Rite's price-cutting practices. He further testified that some distributors requested that Monsanto terminate Spray-Rite's supply of Monsanto herbicides. James Hopkins, president of Hopkins Agricultural Chemical Company, a Monsanto distributorship in competition with Spray-Rite, testified that he complained to Monsanto about Spray-Rite's prices. Emmett McCormick, a former Monsanto Area Supervisor, testified that Monsanto was concerned about stabilizing the resale price of its herbicides and that Monsanto considered Spray-Rite a price-cutter. Yapp, president of Spray-Rite, testified that various Monsanto District Managers in 1966, 1967, and 1968 threatened to terminate his distributorship if he did not raise his prices. Finally, Monsanto did terminate Spray-Rite in 1968.

Monsanto claims that it terminated Spray-Rite because Spray-Rite was not satisfying Monsanto's announced distributorship criteria. William Bone, a Monsanto District Sales Manager, testified that Spray-Rite lacked technically trained employees capable of promoting Monsanto products. Bone admitted, however, that he never discussed the distributorship criteria with Yapp and that neither he nor anyone else from Monsanto informed Yapp in 1968 that Spray-Rite was failing to meet Monsanto's criteria. Moreover, Allen Davis, a Monsanto Manager of Marketing Administration, testified that Spray-Rite was the tenth largest purchaser of Monsanto products in 1968. Davis further testified that Monsanto gave Spray-Rite no written reasons for termination. Yapp testified that Donald Fischer, a Monsanto District Manager, told him that Monsanto terminated Spray-Rite because of price complaints about Spray-Rite. Although the evidence concerning Monsanto's reasons for terminating Spray-Rite was conflicting, the jury was not required to accept Monsanto's version of the case.[8] There was sufficient evi-

---

7. Monsanto relies on *Roesch, Inc. v. Star Cooler Corp.,* 671 F.2d 1168 (8th Cir. 1982), as an indication that the Eighth Circuit has not rejected the *Sweeney* rule. In *Roesch,* the court affirmed the district court order directing a verdict against the plaintiff who claimed that Star Cooler Corporation conspired with two of its distributors to terminate Roesch's distributorship because Roesch was a price-cutter. The sole evidence of the alleged conspiracy was proof of price complaints and proof of termination. The Eighth Circuit held "that mere complaints by customers of a manufacturer that distributors and dealers engage in price-cutting are not enough to imply a conspiracy in violation of section 1." *Id.* at 1172.

The Eighth Circuit decided both *Roesch* and *Battle* on March 4, 1982. Neither opinion cited or discussed the other. To the extent that the holdings in these two cases conflict, we follow *Battle.*

8. Monsanto's reliance on *H. L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935 (2d Cir. 1981), is misplaced. Eli Lilly told H. L. Moore that its distributorship would be terminated unless Moore complied with Lilly's long-standing rule prohibiting wholesalers from owning retail pharmacies. The only evidence of a conspiracy to fix resale prices was evidence of a price complaint from one distributor. The plaintiff simply failed to adduce sufficient evidence of a conspiracy to terminate its distributorship. In this case, however, we have evidence of many complaints coupled with evidence refuting Monsanto's alleged independent business reason for terminating Spray-Rite.

**1240**

dence to support the jury's verdict that Monsanto terminated Spray-Rite pursuant to a conspiracy with other distributors to fix the resale price of Monsanto herbicides.[9]

### B. *Post-Termination Boycott of Spray-Rite*

Monsanto argues that Spray-Rite failed to adduce sufficient evidence to support the jury's finding that Monsanto combined with some of its distributors to boycott Spray-Rite because the evidence showed that Spray-Rite was able to purchase some Monsanto herbicides from Monsanto distributors after it was terminated. We disagree.

■ Yapp testified that he contacted several distributors after Spray-Rite was terminated, and they refused to sell Monsanto herbicides to Spray-Rite. John Mulvehill of Mid-State Chemical Company testified that he refused to deal with Spray-Rite because Stewart Daniels and Max Albertson of Monsanto threatened to terminate Mid-State's distributorship if it sold to Spray-Rite. Moreover, Emmett McCormick of Monsanto testified that Monsanto attempted to prevent Spray-Rite from obtaining Monsanto herbicides after termination. He also testified that he told Fred Bailey of Associated Producers not to sell to Spray-Rite. This evidence is sufficient to support the jury's finding that Monsanto and some of its distributors engaged in an unlawful group boycott of Spray-Rite. *E.g., United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).[10]

### C. *Proof of the Amount of Damage*

Finally, Monsanto claims that Spray-Rite's evidence of the damage suffered is insufficient to support the untrebled jury verdict of $3,500,000. Dr. Urban Ozanne, Professor of Marketing and Chairman of the Marketing Department, College of Business, Florida State University, presented the only testimony concerning the amount of damage caused by Monsanto's unlawful practices. Dr. Ozanne testified that Monsanto's termination of Spray-Rite, the post-termination boycott, Monsanto's post-termination compensation programs, delivery policies, and territorial restrictions forced Spray-Rite out of business in 1972. He further testified that Spray-Rite's sales decreased between 1968 and 1972 because of Spray-Rite's inability to obtain a sufficient quantity of Monsanto products. He calculated that Spray-Rite lost profits of $3,327,-588 between 1968 and 1978. Dr. Ozanne's $3,327,588 calculation included losses incurred between 1968 and 1972 when Spray-Rite's sales were declining and losses incurred between 1972 and 1978 when Spray-Rite was out of business.

Dr. Ozanne did not attempt to account separately for the amount of damage caused by each of the Monsanto business practices he considered. He admitted that relying on his testimony, the jury would be unable to determine the amount of damage caused by each practice. He contended that "it would be very difficult" to compute the amount of damage caused by each practice "because these things merge together and interact among themselves—very difficult. You would have to make tremendous assumptions." Tr. at 2897. He did testify, however, that Monsanto's challenged business practices were the sole causes of all of Spray-Rite's damages.

---

**9.** Because we hold that Spray-Rite presented sufficient evidence to support the jury's verdict on its theory that Monsanto terminated the Spray-Rite distributorship pursuant to a resale price maintenance agreement between Monsanto and some of its distributors, we need not decide whether Spray-Rite presented sufficient evidence to support a verdict based on the theory that Monsanto effectuated its resale price maintenance scheme by coercing distributors into adhering to Monsanto's suggested resale price.

**10.** Monsanto's reliance on *McClure v. Undersea Industries, Inc.*, 671 F.2d 1287 (11th Cir. 1982), is misplaced. McClure claimed that several of Undersea Industries' other distributors boycotted McClure after Undersea terminated McClure's distributorship. The Eleventh Circuit reversed the judgment in favor of McClure on the sole ground that McClure failed to prove any damages caused by the boycott. *Id.* at 1291. The court, however, never reached the issue of whether McClure presented sufficient proof of a conspiracy to boycott. *McClure*, thus, is inapposite.

In calculating the amount of damages, Dr. Ozanne used a regression analysis based on Spray-Rite's past performance, projected future performance, and industry trends. He testified that he used statistics, economics, econometrics, and cost accounting in reaching his conclusions, but admitted that he is not an expert in any of these fields. He also testified that he used a computer to check his calculations, but admitted that he is not a computer expert and that he did not write the computer programs that he used.

### 1. Admissibility of Dr. Ozanne's Testimony

Monsanto claims that because Dr. Ozanne admitted he was not an expert in all the fields of study on which he relied in preparing his damage testimony, the district court erred in permitting him to testify as an expert.

■ An expert must be "qualified as an expert by knowledge, skill, experience, training, or education." Rule 702, Fed.R. Evid. The district court is vested with broad discretion to determine whether a proffered expert is qualified to testify. We will reverse the court's ruling on the admissibility of expert testimony only upon a clear showing of abuse of discretion. *United States v. West*, 670 F.2d 675 (7th Cir. 1982); *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973). Monsanto has failed to make such a showing.

■ Dr. Ozanne is qualified as an expert. He is a recognized marketing expert. *Greene v. General Foods Corp.*, 517 F.2d 635, 660 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976). He testified that he obtained his doctorate in business administration from Indiana University in 1967; his major was marketing and his minors were economics, management, and international business. He has published articles concerning procedures for computing business damages. He has consulted concerning forecasting sales, expenses, and profits, and he has testified about these subjects in other cases. Although Dr. Ozanne is not an expert in computers, regression analysis, statistics, economics, econometrics, or cost accounting, he is trained to use these methods. Moreover, he testified that marketing analysts "constantly" use these methods. Tr. at 3005–07. The fact that Dr. Ozanne is not an expert in all the fields of studies on which marketing analysts regularly rely "does not make him obviously unqualified in light of his other credentials and experience." *California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1003 (9th Cir. 1981).

Monsanto claims that the district court erred in admitting Dr. Ozanne's testimony because his opinion was not based on facts as required by rule 703 of the Federal Rules of Evidence. Dr. Ozanne testified that Spray-Rite's damages were caused by Monsanto's conspiracy to fix the resale price of Monsanto products and to boycott Spray-Rite. He testified that the conspiracy was the "only event of substance" that affected Spray-Rite's business after 1968. He admitted, however, that any other events of substance necessarily would have affected the accuracy of his damages projection if they had occurred. Monsanto claims that the evidence at trial indicated that other events of substance did occur after 1968, including an industry increase in interbrand and intrabrand competition. Monsanto argues that Dr. Ozanne's damage opinion is not based on facts because he failed to consider the effect of these other events of substance, and, thus, his testimony should have been excluded. Moreover, Monsanto argues that Dr. Ozanne's testimony should have been excluded because he improperly included in his damages calculation Spray-Rite's post-1972 loss of customers who never purchased Monsanto products.

■ Several herbicide distributors, including Donald Yapp, testified that a distributor needed to carry all brands of herbicides because dealers and farmers wanted to buy all their herbicides from one seller. Monsanto, of course, disagrees. Nevertheless, this was a fact in evidence upon which

Dr. Ozanne could properly base his damage calculation. Similarly, Dr. Ozanne could properly conclude that no other events of substance occurred and rely on the causes of damage he cited. Dr. Ozanne's failure to consider the effect of factors Monsanto argued he should have considered reflects on his credibility, but it does not make his testimony inadmissible.

■■■■ Finally, Monsanto argues that the district court should have excluded Dr. Ozanne's testimony because Spray-Rite cannot recover damages for the destruction of its entire business. Monsanto relies on *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477 (7th Cir. 1980), in which we noted that "[t]he favored method of ascertaining damage in antitrust litigation is to consider only that product line or market in which the plaintiff suffered injury rather than plaintiff's entire business." *Id.* at 483 (citations omitted). In *Trabert & Hoeffer*, however, the plaintiff's entire business was not destroyed by the defendant's unlawful termination of Trabert & Hoeffer's Piaget distributorship. If the defendant's unlawful conduct causes the plaintiff to go out of business, the plaintiff is entitled to recover the full amount of that loss. *Shor-line Rambler, Inc. v. American Motors Sales Corp.*, 543 F.2d 601 (7th Cir. 1976).[11]

### 2. *Disaggregation of Damage Sum*

Monsanto claims that the evidence is insufficient to support the $3,500,000 verdict because Spray-Rite failed to prove how much damage was caused by each of the challenged Monsanto practices. Monsanto claims that an antitrust plaintiff bears the burden of disaggregating its damage sum and proving the amount of damage attributable to each of the defendant's challenged business practices.

■■■■ The plaintiff bears the burden of proving the amount of damage suffered as a result of the defendant's unlawful con-

duct. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 561–66, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). There are, however, practicable limits to the scope of this burden. *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 123–24, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). Because a plaintiff can seldom prove the exact amount of antitrust damages, he may sustain his burden with circumstantial evidence and estimates of damage based on reasonable assumptions. *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 879 (7th Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

> Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264–65, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

Dr. Ozanne testified that three factors combined to cause Spray-Rite's damages: (1) Monsanto's termination of the Spray-Rite distributorship; (2) Monsanto's post-termination marketing programs, including the compensation and technical programs, and (3) Monsanto's post-termination marketing policies, including Monsanto's assigned areas of primary responsibility and delivery policies. He testified that it would be "very difficult" to apportion the amount of damage caused by each of these factors "because these things merge together and interact among themselves." Tr. at 2897. Monsanto did not present any evidence refuting Dr. Ozanne's conclusions.

■■■■ A plaintiff claiming injury caused by more than one of the defendant's

---

11. Monsanto also argues that Dr. Ozanne's opinion testimony should have been excluded because he included damages caused by Monsanto's compensation and shipping policies which Monsanto claims were lawful practices.

There was sufficient evidence to support Dr. Ozanne's and the jury's conclusion that these policies were in fact part of Monsanto's unlawful conspiracy. *See* discussion section I., C. *supra.*

unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable. If the plaintiff shows that such proof is impracticable, the burden shifts to the defendant to demonstrate the contrary. *Greene v. General Foods Corp.*, 517 F.2d 635, 665 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 434 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980) (per curiam), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). Any other rule would permit the defendant to escape compensating the plaintiff if the defendant's wrongful conduct were sufficiently varied and effective to render more exact proof of damage impossible. "[A] defendant whose wrongful conduct has rendered difficult the ascertainment of precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d 477, 484 (7th Cir. 1980). Spray-Rite sustained its burden by proving that disaggregation was impracticable; Monsanto failed to rebut Spray-Rite's evidence by showing that disaggregation was indeed possible.

Monsanto argues that we ought to reverse the jury verdict because the second interrogatory indicates that the jury may not have found that the illegal conspiracy included Monsanto's compensation programs *and* its areas of primary responsibility *and* its shipping policy.[12] Assuming that the jury did not find all three practices part of the conspiracy, Monsanto alleges that the jury verdict awarding the total aggregated damage amount requires Monsanto to compensate Spray-Rite for lost profits caused by Monsanto's lawful competition.

■ The only damage evidence introduced at trial established that it was impracticable to disaggregate the damage sum and apportion the amount of damage caused by each of Monsanto's business practices. Because the jury responded "yes" to the second interrogatory, it found at least one of the named practices—the compensation programs, the areas of primary responsibility, or the shipping policy—part of the unlawful resale price maintenance scheme. Clearly, Spray-Rite is entitled to recover the lost profits caused by Monsanto's anti-competitive business practices. We will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct. *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.*, 633 F.2d at 484.[13]

■ Finally, Monsanto argues that the jury verdict must be reversed because it is excessive. The only evidence at trial concerning the amount of damage was Dr. Ozanne's testimony that Spray-Rite suffered $3,327,588 damage. The jury awarded Spray-Rite $3,500,000. We agree with

---

**12.** The second interrogatory, to which the jury responded "yes", asked:

> Were the compensation programs *and/or* areas of primary responsibility, *and/or* shipping policy created by Monsanto pursuant to a conspiracy or combination with one or more of its distributors to fix, maintain or stabilize resale prices of Monsanto herbicides?

Monsanto requested that the interrogatory be phrased in the conjunctive, but the court inserted the "or" at Spray-Rite's request.

**13.** *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980) (per curiam), *cert. denied*, 452

U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981), on which Monsanto relies, is not to the contrary. ILC Peripherals claimed that several of the defendant's business practices were unlawful restraints of trade and that these practices caused it to suffer total damages of $306,580,-000. The district court directed a verdict in defendant's favor on the ground that plaintiff had failed to prove its damages with sufficient specificity. In *ILC Peripherals Leasing Corp.*, however, there was evidence that disaggregation was possible. Where it is possible to apportion the amount of damages caused by the unlawful conduct alone, the defendant cannot be held liable for the plaintiff's losses attributable to lawful competition.

Monsanto that $172,412 of the verdict is excessive. *Alover Distributors, Inc. v. Kroger Co.*, 513 F.2d 1137, 1141–42 (7th Cir. 1975). Reversal is unnecessary, however, if Spray-Rite will accept a remittitur of $172,412. If Spray-Rite will consent to the remittitur, the judgment shall be reduced to $3,327,588 and this reduced judgment will be affirmed. If Spray-Rite refuses to accept the remittitur, the judgment will be reversed and the case remanded for a new trial on the question of the amount of damages. *Id.*

### III. *Evidentiary Challenges*

Monsanto claims that the district court made several erroneous evidentiary rulings. Monsanto claims that the court erred (1) in failing to exclude speculative testimony, (2) in admitting hearsay statements attributed to distributors that were not shown to be coconspirators, (3) in excluding Monsanto's rebuttal witness, and (4) in permitting Spray-Rite to make a "Golden-Rule" appeal during closing argument.

We will reverse a jury verdict because of an erroneous evidentiary ruling only upon a clear showing that the error affected "a substantial right of the party." Rule 103, Fed.R.Evid. If the error was harmless, the jury verdict must be affirmed. Rule 61, Fed.R.Civ.P. After careful review of the record, we are convinced that any errors that occurred were harmless.

### A. *Speculative Testimony*

A witness may not testify to a matter unless he has personal knowledge of that matter. Rule 602, Fed.R.Evid. Monsanto contends that the district court erred in permitting Michael Flynn, a former Monsanto field salesman, and David Stein, a Monsanto District Sales Manager, to testify concerning Monsanto's reasons for refusing to renew Spray-Rite's distributorship. It is clear from Flynn's and Stein's testimony that they did not know why Monsanto terminated Spray-Rite. Although the court erred in admitting this speculative testimony, the error was harmless. Both men's testimony indicated that they were stating their respective opinions as to why Spray-Rite might not be their choice as a distributor. The jury could not have understood their testimony to be anything other than an opinion. Moreover, Flynn's response was consistent with Monsanto's defense that it refused to renew the Spray-Rite distributorship because Spray-Rite was not meeting the distributorship criteria.[14] David Stein's testimony, on the other hand, was merely cumulative because his testimony corroborated that of other witnesses with personal knowledge.[15] "Where testimony is improperly admitted but 'was merely cumulative on matters which were clearly shown by other admissible evidence [then] . . . the admission of such testimony was harmless.' " *Hannigan v. Sears, Roebuck & Co.*, 410 F.2d 285, 292–93 (7th Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 214, 24 L.Ed.2d 178 (1969) (citations omitted).

### B. *Hearsay Testimony*

Yapp testified that two Monsanto distributors, Phil James of Mid West Agriculture

---

**14.** The following exchange occurred during Flynn's direct examination:

> Q. My question is, did you have conversations with Monsanto representatives about these factors as contributing to Spray-Rite's non-renewal as a distributor?
> A. We weren't asked reasons as to why Spray-Rite was discontinued. As I said, this was done before my entry into the territory; and *hypothesizing with other salesmen* as to who we would want as distributors and who we were glad we didn't have as distributors, Don Yapp's name did come up. *And aside from not meeting the criteria, it was that price was a factor as to why people would not want him as a distributor.*

Tr. at 160 (emphasis added).

**15.** Monsanto complains that the following colloquy should have been excluded:

> Q. . . . Do you know of any instances where instructions were given from the—or from anyone that these—that any terminated distributors were not to get Monsanto products?
> A. . . . I do know that the internal attitude towards Spray-Rite was vehement enough that *if there was instructions* given against anybody, *it could have been* against Spray-Rite because they did not like him at all.

Tr. at 2406 (emphasis added).

and Leo Sterk of Laverty Sprayers, refused to sell Monsanto products to Spray-Rite after its distributorship was terminated. Yapp testified that James explained that Fred Lane of Monsanto had told him to restrict his sales to Mid West's area of primary responsibility. Yapp also testified that Sterk explained that Laverty could not sell Monsanto products to Spray-Rite at a lower price without risk of termination. Sterk testified that he could not recall giving that reason to Yapp as an explanation of why Laverty would not lower its price. Monsanto claims that Yapp's hearsay testimony should have been excluded because Spray-Rite failed to show by a preponderance of the evidence that Mid West and Laverty were part of the conspiracy to boycott Spray-Rite. *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

■ Independent, non-hearsay evidence linked Mid West to the conspiracy. Spray-Rite introduced a memorandum dated November 16, 1970, in which Lane memorialized a conversation with James. The memorandum indicated that Lane reminded James to follow Monsanto's "sales policies." Other evidence indicated that Monsanto's "sales policies" included assigning areas of primary responsibility and encouraging sales in those areas. This evidence is sufficient to link Mid West with the conspiracy. The court did not err in admitting Yapp's hearsay testimony concerning his conversation with Phil James.

■ Because no evidence linked Laverty Sprayers to the conspiracy to boycott Spray-Rite, Yapp's hearsay testimony concerning his conversation with Leo Sterk should have been excluded. We find this error harmless, however, in light of Sterk's testimony that he could not recall telling Yapp that Laverty could not lower its price on Monsanto products for fear that its distributorship would be terminated. Moreover, there is sufficient independent evidence from which the jury reasonably could have found that Monsanto and other distributors conspired to boycott Spray-Rite. We do not believe that this one improperly admitted hearsay statement affected Mon-

santo's substantial rights. Rule 103, Fed.R. Evid.

### C. *Exclusion of Rebuttal Witness*

Monsanto claims that the district court erred in refusing to permit Nate McGuire to testify during rebuttal. McGuire was not listed as a defense witness on the final pretrial witness list, and Monsanto gave Spray-Rite only three days notice of its desire to call McGuire. The court ruled that the three day notice did not give Spray-Rite sufficient time to prepare to cross-examine McGuire. Moreover, Monsanto admitted that it could call another witness who had been listed on the pretrial list. The court ruled that permitting McGuire to testify under these circumstances would be manifestly unfair.

■ In ruling on a party's motion to call a witness not included on a pretrial witness list ordered pursuant to rule 16 of the Federal Rules of Civil Procedure, the district court should consider four factors:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified;

(2) the ability of that party to cure the prejudice;

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court;

(4) bad faith or willfulness in failing to comply with the court's order.

*Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977), *quoted in De Marines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978). The district court gave due consideration to these factors and concluded that permitting Monsanto to call McGuire would prejudice Spray-Rite because Spray-Rite did not have adequate time to prepare for the witness. Any prejudice to Monsanto engendered by excluding McGuire's testimony could be cured by the testimony of the other available, listed witnesses. Under these circumstances, the district court did not abuse its

discretion in excluding McGuire's testimony. *Franklin Music Co. v. ABC*, 616 F.2d 528 (3d Cir. 1979).

### D. *"Golden Rule" Appeal*

Monsanto argues that Spray-Rite's appeal to sympathy in its closing argument requires reversal. Spray-Rite made the following appeal during its closing rebuttal argument:

> Mr. Jinkinson: Ladies of the jury, I want to tell you that I'm not standing here before you with my hat in my hand asking you to give me something. I think this record shows that Spray-Rite and Don Yapp are entitled to substantial damages in this case. I only ask you in your consideration to take the position that if you traded seats with Don Yapp and he was in the box, I would ask him—
>
> Mr. Bartlit: I object to that as improper.
>
> Mr. Jinkinson: —to give you the same consideration.—
>
> The Court: It is argument.
>
> Mr. Jinkinson: —the same deliberation as you would if you were a plaintiff in this case, that's all we're asking. We want you to consider this thoroughly, impartially. We want you to—and I ask you to return a substantial verdict for my client, Spray-Rite Corporation.

Tr. at 4325–26.

A "Golden Rule" appeal in which the jury is asked to put itself in the plaintiff's position "is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Ivy v. Security Barge Lines, Inc.*, 585 F.2d 732, 741 (5th Cir. 1978), *rev. on other grounds*, 606 F.2d 524 (5th Cir. 1979) (en banc), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815, *reh. denied*, 448 U.S. 912, 101 S.Ct. 27, 65 L.Ed.2d 1173, *on remand*, 89 F.R.D. 322 (N.D.Miss.1980). *Accord, Shroyer v. Kaufman*, 426 F.2d 1032, 1033 (7th Cir.

1970). Spray-Rite's counsel should have refrained from asking the jury to put itself in Spray-Rite's position when it decided how much to award Spray-Rite. The remark was clearly improper, but we are not convinced that it was so prejudicial that it deprived Monsanto of a fair trial. The appeal to sympathy was not repeated. *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53, 55 (7th Cir.), *cert. denied*, 361 U.S. 877, 80 S.Ct. 141, 4 L.Ed.2d 114 (1959). Moreover, the jury was properly instructed concerning the law it should apply in determining liability and damages. We certainly do not condone Spray-Rite's argument, but we find that it was harmless error. *Shroyer v. Kaufman*, 426 F.2d 1032 (7th Cir. 1970).

**No. 80–1621: Monsanto's appeal from the amended judgment.**

Monsanto appeals from the district court's March 21, 1980 order granting Spray-Rite's motion to amend the judgment to assess costs and attorneys' fees against Monsanto. We affirm.

On February 21, 1980, the jury returned a verdict against Monsanto and awarded Spray-Rite $3,500,000 damages. The jury responded "yes" to each of three special interrogatories. After dismissing the jury, the court rendered judgment on the verdict. The court announced "that judgment is hereby entered on the verdict in the sum of $10,500,000.00." Later that day the court entered a more specific minute order stating, "Court enters judgment in favor of plaintiff on the jury's verdict. The Court trebles damages and assesses damages in the amount of $10,500,000.00 plus interest at the legal rate *and costs*." (Emphasis added.)

Because the jury returned a general verdict accompanied by responses to special interrogatories, the Clerk of the District Court was not empowered to enter judgment until he received an approved verdict form from the court.[16] On February 22,

---

16. Rule 58, Fed.R.Civ.P., provides:

Subject to the provisions of Rule 54(b): (1) upon a general verdict of a jury, or upon a decision by the court that a party shall recover only a sum certain or costs or that all relief shall be denied, the clerk, unless the

1980, the clerk entered judgment pursuant to the court's minute order. The clerk, however, mistranscribed the approved verdict form and deleted the court's reference to costs.[17]

On March 11, 1980, eighteen days after judgment was entered, Spray-Rite filed a motion to amend the judgment to assess costs and attorneys' fees. Monsanto contested the motion on the ground that it was untimely. Monsanto argued in the district court, as it does on appeal, that Spray-Rite's motion was a rule 59(e), Federal Rules of Civil Procedure, motion to amend the judgment.[18] Monsanto argued that the court lacked jurisdiction to grant the motion because it was not filed within ten days after entry of judgment.

The district court rejected Monsanto's argument and granted Spray-Rite's motion on March 21, 1980. The district court ordered the clerk to amend the judgment pursuant to rule 60(a), Federal Rules of Civil Procedure.[19] On March 28, 1980, the clerk entered the amended judgment assessing damages of $10,500,000 plus interest at the legal rate and costs and attorneys' fees.

Rule 59(e) and rule 60(a) prescribe procedures for different types of post-judgment relief. A rule 59(e) motion, which must be filed within ten days after entry of judgment, seeks correction of an error of substantive law, *White v. New Hampshire Dept. of Employment Security*, —— U.S. ——, ——, 102 S.Ct. 1162, 1166, 71 L.Ed.2d 325 (1982), whereas a rule 60(a) motion, which may be filed at any time, seeks correction of a clerical "error of transcription, copying, or calculation." *Bershad v. McDonough*, 469 F.2d 1333, 1336 (7th Cir. 1972).

█ To the extent that Spray-Rite's motion sought to amend the judgment to assess costs, the motion was governed by rule 60(a), not rule 59(e). The only relief sought was correction of the clerk's omission of the assessment of costs, which was included in the court's February 21, 1980 minute order. Because rule 60(a) contains no time limit, Spray-Rite's motion to amend the judgment to assess costs was timely, and the district court had jurisdiction to grant the relief it ordered.

█ We also believe that rule 59(e) does not govern Spray-Rite's motion to amend the judgment to assess attorneys' fees. The Supreme Court recently held that a post-judgment motion for attorneys' fees pursuant to 42 U.S.C. § 1988, which provides that a prevailing party in a civil rights suit shall recover "a reasonable attorney's fee as part of the costs," is not a rule 59(e) motion.

court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court; (2) upon a decision by the court granting other relief, or upon a special verdict or a general verdict accompanied by answers to interrogatories, the court shall promptly approve the form of the judgment, and the clerk shall thereupon enter it. Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a). Entry of the judgment shall not be delayed for the taxing of costs. Attorneys shall not submit forms of judgment except upon direction of the court, and these directions shall not be given as a matter of course.

17. The Judgment Order entered February 22, 1980, stated:

This action came on trial before the court and a jury, Honorable Stanley J. Roszkowski, United States District Judge, presiding, and the issues having been duly tried and the jury having duly rendered its verdict.

It is Ordered and Adjudged that judgment is hereby entered against the defendant, Monsanto Company, and in favor of plaintiff, Spray-Rite Service Corporation, and assesses [sic] damages in the amount of $10,500,-000.00 plus interest at the legal rate.

18. Rule 59(e), Fed.R.Civ.P., provides:

(e) Motion to Alter or Amend a Judgment. A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

19. Rule 60(a), Fed.R.Civ.P., provides, in pertinent part:

(a) Clerical Mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.

*White v. New Hampshire Dept. of Employment Security*, —— U.S. ——, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982). The court held that rule 59(e) only governs post-judgment motions seeking reconsideration of the decision on the merits. *Id.* at ——, 102 S.Ct. at 1165. The court reasoned that "[b]y contrast, a request for attorney's fees under § 1988 raises legal issues collateral to the main cause of action—issues to which Rule 59(e) was never intended to apply." *Id.*

Like 42 U.S.C. § 1988, section 4 of the Clayton Act, 15 U.S.C. § 15, provides that prevailing antitrust plaintiffs shall recover attorneys' fees as well as costs.[20] Because of the similarity of these two statutory provisions, we believe that the Supreme Court's reasoning in *White* applies in this instance. Spray-Rite's motion to amend the judgment to assess costs raised issues collat-

eral to the merits of the antitrust cause of action "—issues to which rule 59(e) was never intended to apply." *White v. New Hampshire Dept. of Employment Security*, —— U.S. at ——, 102 S.Ct. at 1166 (1982). *Accord, Bond v. Stanton*, 630 F.2d 1231 (7th Cir. 1980), *later appeal*, 655 F.2d 766 (7th Cir.), *cert. denied sub nom. Blinzinger v. Bond*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981).

In this Circuit, a motion to amend the judgment to assess attorneys' fees which raises issues collateral to the merits of the cause of action is governed by rule 54(d), Federal Rules of Civil Procedure,[21] which "imposes no time limit apart from an implicit requirement of reasonableness." *Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 655 (7th Cir. 1981).[22] Spray-

---

**20.** Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States or in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, *and shall recover* threefold the damages by him sustained, and *the cost of suit, including* reasonable attorney's fees.

(Emphasis added.)

**21.** Rule 54(d), Fed.R.Civ.P., provides:

(d) Costs. Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on one day's notice. On motion served within 5 days thereafter, the action of the clerk may be reviewed by the court.

The Supreme Court in *White* declined to decide whether the motion to amend the judgment to assess attorneys' fees was governed by rules 54(d) and 58, Fed.R.Civ.P. *White v. New Hampshire Dept. of Employment Security*, —— U.S. ——, ——, 102 S.Ct. 1162, 1168, 71 L.Ed.2d 325 (1982). Instead, the Court noted that district courts could adopt local rules "establishing timeliness standards for the filing of claims for attorney's fees." *Id.* at ——, 102 S.Ct. at 1168.

**22.** In *Hairline Creations*, the plaintiff's motion to amend the judgment to assess attorneys'

fees was based on 15 U.S.C. § 1117, which authorizes the court to award reasonable attorneys' fees to the prevailing party in a trademark violation case "in exceptional cases." We held that the plaintiff's motion was governed by rule 59(e) because the decision whether to assess fees was not collateral to the merits of the underlying cause of action.

The exercise of discretionary authority to award attorneys' fees is inextricably intertwined with the factual and legal issues that the trial court resolves at judgment. Second, the award of attorneys' fees is merely one of several potential remedies for trademark violations.... A motion for attorneys' fees would, therefore, require the trial court to reexamine the basis of the judgment to determine if the "exceptional" requirement had been met so as to justify the remedy. This characterization of § 1117 leads inescapably to the conclusion that a post-judgment motion for attorneys' fees is a motion to alter or amend the judgment.

*Id.* at 658. We distinguished § 1117 from 42 U.S.C. § 1988, the attorneys' fees provision at issue in *White v. New Hampshire Dept. of Employment Security*, —— U.S. ——, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), noting that attorneys' fees under § 1988 are in the nature of an equitable award which is governed by rule 54(d). Section 4 of the Clayton Act's award of attorneys' fees is more analogous to § 1988 than to § 1117 because both § 4 and § 1988 provide for recovery of attorneys' fees as of right if the plaintiff prevails. Section 1117, on the other hand, permits recovery of attorneys' fees only if the plaintiff prevails in an "exceptional" case.

Rite's motion was filed within eighteen days after entry of judgment. Monsanto has not alleged that it was prejudiced in any way by this delay or that the delay was unreasonable. The district court, therefore, did not err in granting Spray-Rite's motion to amend the judgment.

No. 80–2233: Spray-Rite's cross-appeal from the unamended judgment.

Spray-Rite cross-appeals from the judgment entered February 22, 1980, to the extent that it failed to assess costs and attorneys' fees. The amended judgment entered March 28, 1980, superseded the judgment entered February 22, 1980, and awarded Spray-Rite the relief it seeks in this cross-appeal. Accordingly, we dismiss Spray-Rite's cross-appeal.

No. 80–2624: Monsanto's appeal from the award of $895,747.80 in attorneys' fees.

Monsanto appeals from the October 17, 1980 district court order awarding Spray-Rite $895,747.80 in attorneys' fees.[23] Monsanto claims that the court erred in awarding fees (1) for time billed on issues for which no recovery was obtained, (2) for time billed on the question of fees, (3) for time billed for duplicative efforts, and (4) for time billed by paralegal assistants and law clerks. We agree that the district court erred in assessing attorneys' fees for time billed on issues for which Spray-Rite did not obtain recovery, and accordingly we affirm the judgment in part and reverse and remand in part.

 The successful antitrust plaintiff is entitled to recover attorneys' fees as a matter of right. 15 U.S.C. § 15. The plaintiff bears the burden of establishing the amount of compensable attorney time reasonably devoted to prosecuting its cause of action. *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1216 (3d Cir. 1978). We will disturb the district court's decision regarding the amount of fees only upon a clear showing of abuse of discretion, *Prandini v. National Tea Co.*, 585 F.2d 47, 51 (3d Cir.), *on remand*, 80 F.R.D. 447 (W.D. Pa.1978).[24] In exercising its discretion, the district court should consider "the reasonableness of the time spent by counsel, the extent of counsel's success, and the complexity of the case." *Waters v. Wisconsin Steel Workers*, 502 F.2d 1309, 1322 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976).

Spray-Rite's petition for fees requested a lodestar amount of $895,747.80. The billing records Spray-Rite attached to the petition detailed the individuals who worked on the case, the period of time during which they each participated in the preparation of the case, the amount of time expended by each individual, the nature of the work performed, and the hourly billing rate for each individual. Monsanto objected to several of the items included in the request. Both parties filed memoranda with the court, and on October 17, 1980, the district court entered an order awarding Spray-Rite the total amount of attorneys' fees requested.

Monsanto claims that the district court abused its discretion by awarding Spray-Rite $63,370.25 for time billed by law clerks and paralegal assistants. Monsanto contends that paralegal fees may be recovered only to the extent that their billing is included as overhead in the lawyers' billing rates. We disagree.

**23.** Monsanto does not appeal from that portion of the October 17, 1980 order awarding Spray-Rite $16,875.79 in costs.

**24.** The circuits that have addressed the issue all agree that a court of appeals may overturn a district court award of attorneys' fees to a successful antitrust plaintiff only upon a showing of abuse of discretion. *Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575, 581 (5th Cir. 1980); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255, 1274 (8th Cir.), *cert. denied*, 449 U.S. 1063, 101 S.Ct. 787,

66 L.Ed.2d 605 (1980); *Merola v. Atlantic Richfield Co.*, 493 F.2d 292, 295 (3d Cir. 1974), *later appeal*, 515 F.2d 165 (3d Cir. 1975); *Alpine Pharmacy, Inc. v. Charles Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied sub nom. Patlogan v. Dickstein, Shapiro & Galligan*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973); *Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.*, 358 F.2d 790, 794 (6th Cir. 1966); *Twentieth Century Fox Film Corp. v. Goldwyn*, 328 F.2d 190, 221 (9th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964).

Only two circuit courts of appeals have considered whether paralegal fees are recoverable under section 4 of the Clayton Act, 15 U.S.C. § 15. The Second Circuit reversed the district court award of paralegal fees holding that these fees "cannot be considered as input in the fee award determination." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 473 (2d Cir. 1974). The Ninth Circuit, however, affirmed the district court's award of paralegal fees. *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1210 (9th Cir. 1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). The Ninth Circuit quoted with approval the following language from the district court's opinion:

> As a matter of practice, most attorneys engaged in the antitrust practice use such legal assistants, particularly in digesting and indexing discovery and trial materials, much of the work heretofore performed by relatively inexperienced lawyers .... As a matter of policy, the use of paralegal help in this fashion greatly reduces the cost of legal services to the public and thus is a practice to be encouraged.

*Id.* at 1210 n.19. We think the Ninth Circuit has adopted the better view and, accordingly, we hold that paralegal and law clerk fees are recoverable as a portion of the plaintiff's reasonable attorneys' fees. The court did not abuse its discretion in awarding Spray-Rite $63,370.25 in paralegal fees.

Monsanto also claims that the court erred in awarding attorneys' fees for time spent on the question of fees. Monsanto argues that Spray-Rite cannot recover for 73 hours spent on preparation of the fees petition or for 113.25 hours spent on amending the judgment to assess attorneys' fees. In support of its argument, Monsanto relies on *Locklin v. Day-Glo Color Corp.*, 378 F.Supp. 423, 429 (N.D.Ill.1974), in which the district court held that "time devoted to compiling and presenting the bill is beyond the scope of effort for which fees are to be allowed." Other circuits, however, have rejected the *Locklin* court's view. *Prandini v. National Tea Co.*, 585 F.2d 47, 53 (3d Cir.),

*on remand*, 80 F.R.D. 447 (W.D.Pa.1978); *Perkins v. Standard Oil Co. of California*, 474 F.2d 549, 555 (9th Cir.), *cert. denied*, 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973). We likewise have held that time spent litigating the question of fees is compensable. *Bond v. Stanton*, 630 F.2d 1231, 1235 (7th Cir. 1980), *later appeal*, 655 F.2d 766 (7th Cir.), *cert. denied sub nom. Blinzinger v. Bond*, 454 U.S. 1063, 102 S.Ct. 614, 70 L.Ed.2d 601 (1981) (fees pursuant to 42 U.S.C. § 1988). We think that this is the better view.

> To the extent that courts prescribe procedures which must be exhausted before a successful plaintiff may obtain the fruit of his invocation of the judicial process, the expense of complying with such procedures is just as much a condition precedent to a litigant's obtaining the relief to which he is entitled as the outlay for court costs which litigants ... must fork out before indulging in the privilege of seeking justice at the hands of a judicial tribunal. We therefore conclude that the time devoted by plaintiff's attorneys in prosecuting the fee application should not be excluded.

*Pitchford Scientific Instruments Corp. v. Pepi, Inc.*, 440 F.Supp. 1175, 117!–80 (W.D. Pa.1977), *aff'd without opinion*, 582 F.2d 1275 (3d Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 242 (1979). The district court did not abuse its discretion in awarding Spray-Rite attorneys' fees for time spent on the issue of fees.

Monsanto further claims that the court erred in awarding Spray-Rite attorneys' fees for duplicative efforts. Monsanto contends that Spray-Rite's attorneys billed so many hours that there must have been a substantial duplication of efforts.

Spray-Rite's fee petition included a total of 13,400 hours billed. The trial of this case consumed six weeks. In view of the length of the trial and the concomitant time necessary for adequate preparation of the case, we find that the district court did not err in rejecting Monsanto's assumption that some of the billed hours were necessarily duplicative.

Finally, Monsanto claims that the court erred in awarding Spray-Rite fees billed for time spent on issues for which Spray-Rite did not obtain recovery. Spray-Rite's original complaint included four counts: a conspiracy to restrain trade count, 15 U.S.C. § 1, a Robinson-Patman Act discriminatory price count, 15 U.S.C. § 13(a), and two monopolization counts, 15 U.S.C. § 2. Spray-Rite dropped the Robinson-Patman and monopolization counts before trial. Monsanto argues that section 4 of the Clayton Act permits recovery of attorneys' fees only for time billed on issues on which the plaintiff prevailed. Monsanto contends that Spray-Rite cannot recover attorneys' fees for time expended on the Robinson-Patman and monopolization counts because Spray-Rite did not prevail on those charges. *See Bryam Concretanks, Inc. v. Warren Concrete Products Co.,* 374 F.2d 649 (3d Cir. 1967).

■■■■ "[O]nly work devoted to the successful recovery of treble damages may be compensated. However, to the extent that work bore on both a successfully asserted antitrust claim and other, noncompensable claims, that work may be fully taken into account." *Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1057 (S.D.N.Y.1977), *aff'd without opinion,* 578 F.2d 1368 (2d Cir. 1978) (citation omitted). Spray-Rite may recover for time expended on the Robinson-Patman and monopolization counts only if that work also bore on the successfully litigated conspiracy charge. To recover on the Robinson-Patman claim, Spray-Rite would have had to prove that Monsanto charged a discriminatory price within some limited, relevant market. Moreover, Spray-Rite would have had to have been prepared to rebut an affirmative defense that Monsanto's discriminatory price was needed to meet competition. *Vanco Beverages, Inc. v. Falls City Industries, Inc.,* 654 F.2d 1224 (7th Cir. 1981). To prevail on the monopolization counts, Spray-Rite would have borne the burden of proving that Monsanto possessed monopoly power in the relevant market and that Monsanto wilfully acquired or maintained that power. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir. 1980). Both of these counts require substantially different proof than that necessary to sustain Spray-Rite's burden on the conspiracy to restrain trade count. Monsanto is not required to compensate Spray-Rite for time devoted exclusively to developing the Robinson-Patman and monopolization counts. Spray-Rite's petition did not indicate what portion of the billed time was devoted to developing the two abandoned theories. On remand Spray-Rite will bear the burden of showing which portion of the billed time was devoted to the successfully litigated conspiracy charge.

Conclusion

For the reasons stated in this opinion, we affirm the amended judgment of the district court against Monsanto if Spray-Rite will accept a remittitur of $172,412. If Spray-Rite refuses to accept the remittitur, the judgment will be reversed and the case remanded for a new trial on the question of damages. We dismiss Spray-Rite's cross-appeal, and affirm in part and reverse and remand in part the award of $895,747.80 in attorneys' fees.