**ALOVER DISTRIBUTORS, INC.,
Plaintiff-Appellee, Cross
Appellant,**

**v.**

**The KROGER CO., Defendant-Appellant, Cross Appellee.**

Nos. 74–1363, 74–1364.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1975.

Decided April 15, 1975.

David P. List, Chicago, Ill., for Kroger.

James B. Rice, Chicago, Ill., for Alover.

Before PELL, Circuit Judge, TONE, Circuit Judge, and JAMESON, Senior District Judge.*

JAMESON, Senior District Judge.

This is an action for the alleged breach of a contract dated April 11, 1969 between plaintiff-appellee and cross-appellant, Alover Distributors, Inc. and defendant-appellant and cross-appellee, The Kroger Company. The contract provided that Alover would deliver ice cream to Kroger's stores located in the Chicago area for (1) a specified sum per gallon of ice cream delivered and (2) a minimum gallonage guarantee during each year of a five-year contract. Following a jury trial, Alover was awarded $53,000.00 damages for Kroger's breach of the contract.

In Cause No. 74–1363, Kroger appeals on the grounds that (1) Alover breached the contract first; and (2) the damages awarded by the jury were not supported by the evidence. In Cause No. 74–1364, Alover cross-appeals, claiming that the court erred in refusing to instruct the jury that Alover was entitled to damages in an amount equal to the minimum gallonage guaranteed under the contract times the rate per gallon.

In the initial agreement between Alover, a corporation formed for the purposes of the contract by James Litwin (who became Alover's president), Kroger guaranteed that Alover would deliver 800,000 gallons of ice cream during the first contract year and would be paid 12 cents a gallon. The minimum gallonage would increase at the rate of 40,000 gallons per year, thus providing for the delivery of 960,000 gallons in the last contract year.

As a result of Union pressure, Alover was forced to change from the call order system to the more expensive peddle system of distribution.[1] In order to assist Alover in meeting the higher cost of delivery, Kroger on August 25, 1969, agreed to increase the minimum gallonage to one million gallons in the first year, with the same 40,000 increase in each subsequent year, thus providing for a minimum of 1,160,000 gallons in the fifth contract year.

During the next two years until June of 1972, Kroger paid Alover an amount equal to the minimum gallonage times

---

* Senior Judge William J. Jameson of the District of Montana is sitting by designation.

1. Under the call-order system, the stores specify what they need and the drivers merely assemble the order and deliver it. The peddle system, on the other hand, requires a driver to estimate what the stores are going to need. This system involves more trips and entails a risk of not having the products that the store needs and having products left over in the trucks at the end of the day.

the rate per gallon,[2] although during most of this period Alover actually delivered substantially less than the minimum gallonage. Thus, during fiscal year 1969–70, Alover delivered 790,560 gallons of ice cream but was paid for 970,699 gallons; in fiscal year 1970–71, Alover delivered 556,478 gallons and was paid for 1,057,631 gallons; and in fiscal year 1971–72, Alover delivered 253,816 gallons and was paid for 1,047,423 gallons.

The primary reason for the declining delivery by Alover was the closing of Kroger stores in the Chicago area commencing in 1970. Furthermore, in June or July of 1970, at the request of Alover, Kroger agreed to transfer the handling of deliveries to certain Kroger stores outside of Chicago to its Peoria Division. In light of these circumstances, Kroger sought reductions in the minimum gallonage. Alover refused.[3] Between November, 1970 and March, 1971, however, Alover did make deliveries to 13 K–Marts having no connection with Kroger, and Alover credited these deliveries against Kroger's minimum guarantee.

Concerned about these developments, Kroger suggested that Alover and Kroger representatives and their attorneys meet to discuss the future of the contract. A meeting was held in April of 1971. In light of the closing of many of its Chicago stores and the resulting decrease in the ice cream delivered by Alover, Kroger proposed a number of alternatives, including (1) cancellation of the contract with an agreed amount to be paid to Alover; (2) modification of the guaranteed minimum gallonage; or (3) the creation of other outlets, thus increasing the gallonage actually delivered by Alover. Alover's representatives indicated a preference for the third alternative. Litwin testified that Alover's attorney stated that Alover "would serve anything that they (Kroger) wanted us to providing they got the okay from the Union".[4]

Following the meeting and an exchange of letters,[5] Kroger sought new outlets and in January, 1972 procured the accounts of 13 or 14 Super-X Drug Stores. Shortly thereafter, Kroger obtained the A & P Company account for 13 of A & P's Chicago area stores. Alover commenced deliveries to these stores. The Union, however, objected to the deliveries by Alover to the A & Ps unless Alover paid its drivers on a commission basis rather than on the hourly basis that Alover had always paid its drivers. Contending that the cost of paying drivers on a commission basis was too great, Alover refused to make any further deliveries to the A & Ps.

Reacting to Alover's refusal to deliver to the A & Ps, Kroger informed Alover that it would only pay Alover for gallonage actually delivered. Kroger thereafter sent checks to Alover representing payment for gallonage actually delivered and informed Alover that these checks could be cashed without prejudice to its claim against Kroger. Alover returned all of these checks to Kroger. By a letter of July 1, 1972, Alover terminated its contract with Kroger on the ground that

---

**2.** Effective June 1, 1970 Kroger, at the request of Alover, increased the rate per gallon from 12 cents to 14 cents.

**3.** Kroger contends that as consideration for increasing the rate per gallon from 12 cents to 14 cents in 1970 Kroger expected Alover to reduce the minimum guaranteed gallonage. A review of the evidence, however, indicates that at the very most Alover agreed to discuss the possibility of reducing the minimum guaranteed gallonage. No contractual obligation existed on the part of Alover to reduce the guaranteed minimum.

**4.** A witness for Kroger testified that nothing was said about getting an okay from the Union.

**5.** A letter from Litwin concluded:

"I would rather that you operate on the theory of keeping the present contract in force and providing additional outlets, and thus increasing the gallonage. As to whether or not we should discuss extending the contract for an additional period, with the uncertain future of the Kroger stores in the Chicago area, and with the difficulty of computing costs so far in the future, it seems better for us to operate under the present contract and when it runs out to negotiate on a year to year basis."

Kroger had failed to pay it as agreed in the contract. Alover then commenced this action to recover damages for Kroger's alleged breach of contract.

On review, this court may not overturn a jury verdict which is supported by substantial evidence. Mohr v. Toledo, Peoria & Western Railroad Co., 232 F.2d 869, 870 (7 Cir. 1956). Kroger contends that the evidence supports only one conclusion, i. e., that Alover, in refusing to serve the A & Ps, breached its contractual obligation and, having breached the contract first, cannot maintain an action for a subsequent breach by Kroger. Kosuga v. Kelly, 257 F.2d 48, 56 (7 Cir. 1958), aff'd, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). Kroger argues that the trial court should have granted Kroger's motion for a directed verdict or its motion for judgment notwithstanding the verdict, or in the alternative, should have granted a new trial as the jury verdict was against the manifest weight of the evidence. Holland v. Chicago Transit Authority, 337 Ill.App. 100, 84 N.E.2d 861 (1949).

■ We cannot agree. Viewing the evidence in the light most favorable to the plaintiff, the jury could properly find that Alover had not assumed a contractual obligation to make deliveries to the A & P stores. At the April, 1971 meeting and in subsequent correspondence, Litwin merely indicated that, of the various alternatives being considered by Kroger, Alover preferred that alternative whereby Kroger would seek new outlets. While there was evidence that Alover would be willing to serve additional outlets provided by Kroger, there was evidence also that this was conditioned on the Union's willingness to allow Alover to pay its drivers making deliveries to the A & Ps on an hourly basis, as it did all of its other drivers. The Union, however, would permit Alover to deliver to the A & Ps only if it paid drivers on a commission basis.

Viewing the evidence as a whole, we find substantial evidence supporting the jury's determination that Kroger and not Alover initially breached the contract.

■ A more difficult question is presented with respect to the award of damages. The district court correctly instructed the jury that if it found Kroger liable, it could compensate Alover for "any of the following elements of damage proved by the evidence to have resulted from the wrongful conduct of the defendant:

"First, the sum of $20,784.59 for deliveries made by plaintiff for defendant's product during the period May 27, 1972 through July 8, 1972;

"Second, plaintiff's loss of profits for the periods July 10, 1972 through June 15, 1973 and June 16, 1973 through June 15, 1974.

The court's instructions continued:

"Where lost profits are sought as damages, they must be based on net profits or a reasonable approximation thereof, and not on gross profits.

"Net profits constitute the difference between gross profits and the expense of operating the business.

· "Lost profits must be established with reasonable certainty and not be based upon speculation." [6]

On the basis of those instructions, the jury awarded Alover $53,000. Kroger contends that the $53,000 award is not supported by the evidence. We agree.

■ "Compensation for breach of contract should place the injured party in the position the party would have been in had the contract been fully performed." United Protective Workers v. Ford Motor Co., 223 F.2d 49, 53 (7 Cir. 1955) quoting from Baer Bros. Land and Cattle Co. v. Palmer, 158 F.2d 278, 280 (10 Cir. 1946). It is true, as Alover contends, that the amount of damages need

---

6. The court properly refused an instruction offered by Alover which included as elements of damages the following language:

"The minimum gallonage times the contract rate for the fourth year of the contract, June 15, 1972 to June 15, 1973, and the minimum gallonage times the contract rate for the fifth year of the contract, June 15, 1973 to June 15, 1974."

not be proved with mathematical precision and that the proof need not be direct, but may, instead, be circumstantial. It is equally clear, however, that "Damages may not be awarded on the basis of conjecture or speculation and the admitted fact of damage is insufficient to prove the amount of damage . . .." Locklin v. Day-Glo Color Corporation, 429 F.2d 873, 879 (7 Cir. 1970); and a plaintiff has the burden of proving the amount of damages by a preponderance of the evidence. *Id.*

■ The damages in this case consisted of two separate items: (1) payments owing Alover for deliveries made between May 27, 1972 and July 8, 1972; and (2) net profits which Alover would have realized between July 10, 1972 and June 15, 1974 but for the breach of contract by Kroger. The first item presents no problem. Alover was entitled to $20,784.59 for the deliveries made during the seven weeks prior to the termination of the contract.

With respect to lost profits, the only evidence presented by Alover was the minimum gallonage guarantee and the fact that Kroger stores were closing and less deliveries being made. On cross-appeal Alover contends that it was entitled to recover the minimum gallonage times the contract rate for the remaining two years of the contract, or a total of $307,138.48. Crediting on this sum the jury award of $32,215.41 (the difference between the total award of $53,000 and the $20,784.59), Alover arrives at a figure of $274,923.07 and urges that the judgment be increased by that amount.

Kroger introduced in evidence the financial statements of Alover to show the profits that Alover had realized during the first three contract years. The statements show a net profit of $9,350.49 in fiscal year 1969–70, $3,114.57 in fiscal 1970–71, and $1,993.37 in fiscal 1971–72.[7] Kroger's expert witness, a certified public accountant, testified that based on Alover's financial statements he projected Alover's profits for 1972–73 to be $3,696 and for 1973–74 to be $3,828, or a total of $7,524 for the last two years of the contract.

Alover argues that it would have little or no expense or costs during the last two years as there would be few, if any, deliveries required. However, there is no evidence to show that Alover would not be making at least the deliveries that it was making at the time of the contract's termination in July, 1972. Alover's claim for damages by reason of its contention that it would not be making future deliveries is based on sheer conjecture and speculation.[8]

■ The only relevant evidence with respect to the net profits which might reasonably be expected during the last two years of the contract was that presented by Kroger, indicating a total of $7,524 for the two years. Adding this figure to the $20,784.59 results in damages of $28,326.59. The award of $53,-

---

7. These figures, combined with the delivery figures during each of the three years, clearly show that Alover's costs were increasing each year despite the fact that it was delivering substantially less gallonage each year.

8. We have examined the transcript of the argument of Alover's counsel to the jury to ascertain whether any reasonable basis for an award was suggested. Counsel recognized the difficulty of determining the amount of damage, noting that the minimum gallonage times the contract price would be "something like $318,000", and stated he was not contending Alover "would be entitled to the whole minimum, in other words, the gallonage rate", which "would be an astronomical figure." He concluded his argument as follows:

"So, in summary, I am going to ask you to look at his costs for those three years, and remembering that at no time did he deliver the minimum, but in each case he was paid the minimum, to figure out what he might have expected to make had Kroger not breached the contract, and had they kept tendering merchandise to him to deliver, and he was delivering and operating on that basis with very small cost of operations.

"I think that you will come to the conclusion that his profits would have been substantial. Certainly, I don't think a hundred thousand dollars is out of line, or more, perhaps. I don't know. I am asking you to look at them and decide."

000 accordingly was excessive in the amount of $24,691.41.

In the event the plaintiff-appellee shall consent to a remittitur of $24,-691.41, the judgment shall be reduced thereby and the judgment below less the remittitur shall stand affirmed. In the event plaintiff-appellee does not consent to the remittitur, the judgment is reversed and the case remanded for a new trial.[9]

9. *See* Hill v. Long Island R. R. Co., 257 F.2d 736, 737 (2 Cir. 1958); 6A Moore's Federal Practice, §§ 59.05(3), 59–67.