**COMBINED NETWORK, INC., an Illinois corporation, Plaintiff-Appellee,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a New York corporation, Defendant-Appellant.**

**No. 85–1983.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1986.

Decided Nov. 12, 1986.

Rehearing Denied Dec. 16, 1986.

John D. Lien, Wilson & McIlvaine, Chicago, Ill., for defendant-appellant.

Mitchell S. Goldgehn, Greenberg, Keele, Lunn & Aronberg, Chicago, Ill., for plaintiff-appellee.

Before BAUER, Chief Judge, CUMMINGS and POSNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Combined Network, Inc. (Combined) is an Illinois corporation. Defendant, The Equitable Life Assurance Society of the United States (Equitable), is a New York corporation. For the time period relevant here Equitable owned Gateway III, an office building at 222 South Riverside Plaza in Chicago, Illinois. Tishman Midwest Management Corporation (Tishman) was Equitable's leasing and managing agent pursuant to a written management agreement. Tishman handled all tenant negotiations for Equitable. In December 1981, Combined sought new office space through Berger Realty Group, Inc. (Berger Realty) for its business. The cast of major players involved in this lease attempt are: Michael Richer (President, Combined), Melvyn Goodman (Executive Vice President and General Counsel, Combined), David Miller (Tishman Marketing Representative for Gateway III), Cameron Estes (Tishman Vice President of Leasing), Richard Symonds (Building Manager of Gateway III), and Charles Vial (Tishman Vice President of Management).

Miller, Goodman, and Allison Peck (Berger Realty) initially met in mid-December 1981 to discuss the possibility of Combined's entering a 10–year lease at Gateway III. Combined hired the architectural firm of Bauhs & Dring to prepare renovation plans. The remodeling was estimated to cost $250,000. On January 6, 1982, Miller, Estes and Goodman met at Combined's offices to discuss lease terms. Shortly thereafter Goodman sent Miller information about Combined's financial position. January negotiations resulted in a proposed $250,000 loan from Equitable to Combined at 17% interest, to be repaid over the 10–year lease term. Estes then spoke with Equitable management and was authorized to proceed with negotiations.

On January 28, 1982, Miller sent Goodman a copy of a draft lease, which proposed a lease term of 5 years and 2 months (March 1, 1982—April 30, 1987) with a 5–year renewal option. Annual rental was to be $263,047 (with a 1981 base year). The draft lease was unacceptable to Combined because the second 5–year term was contingent on another tenant's waiving its currently held option to lease the same premises. On February 4, 1982, Goodman told Estes and Richer that Equitable would have to be responsible for all the moving costs if Combined was forced to move at the end of the first lease term. Estes and Miller agreed. At this same meeting the Tishman people informed Goodman that Equitable's policy was not to allow construction work until the lease was signed. But because the transaction had been approved and Combined wanted to occupy the offices by April, Tishman said if Combined would sign an indemnity agreement, work could begin immediately. Combined agreed to indemnify Tishman for $13,976 and the demolition work began.

On February 5, 1982, Goodman signed the lease and enclosed a check for the first month's rent. The lease contained two paragraphs that committed Equitable to lend Combined a total of $385,000: $250,000 for renovation and $135,000 for equipment, both at 17% interest. Miller reminded Goodman that formal approval (with signatures) was required from Equitable and said that he would call Goodman when the lease was approved.

Tishman sent the lease on to Equitable's lease manager, Frank Schmidt, along with Combined's financial information. Equitable reviewed the financial information around February 10, and concluded it was weak. Goodman testified that on February 10 or 11, 1982, Miller phoned him and informed him that Equitable had signed the lease. Miller denied this phone call, but did testify that during this time period he was aware that Equitable had not signed the lease. On February 15, 1982, Combined

entered into a contract with Interior Alterations for remodeling work.

On February 18 or 19 Miller informed Goodman that Equitable wanted to change the lease so that Goodman and Richer would personally guarantee the loan. Goodman expressed dissatisfaction with Equitable's attempt to modify the contract and said that he would try to work something out but that the requested changes were unacceptable. Goodman suggested they meet later to discuss and attempt to resolve Equitable's concerns. On February 24, before that meeting, Vial directed Interior Alterations to stop construction work. When Goodman discovered what Vial had done, he called Miller and claimed that Equitable was breaching their signed agreement. The next day Miller told Goodman that the construction workers were back on the job as per the agreement. Interior Alterations continued to work until March 3, 1982.

Negotiations for what Goodman believed to be contract modifications continued into March. Equitable decided that it would not approve the loan to Combined. Miller informed Goodman that Equitable would only approve a 5–year "as-is" lease. An agreement could not be reached; Combined's rent check was returned. It was not until this point that Goodman discovered that the lease had never been signed.

Combined was billed $63,328.04 by Interior Alterations for its work at Gateway III. Demolition work totalled $11,443.09. Work performed by a subcontractor, Continental Electric, accounted for $23,065.29 of the invoice, and Continental sued Combined and Interior Alterations for that amount. The suit was later dismissed for want of prosecution.

In April 1982, Combined leased alternative space for its corporate headquarters at Hartford Plaza in Chicago. The rent at Hartford Plaza was $17.64 per square foot, which included the cost of preparing the premises for occupancy. The base rent at Gateway III had been set at $14.50, without improvements. Considering the base rent for Gateway III and factoring in the additional $250,000 loan for tenant improvements, Combined would have been able to rent space at Gateway III for $15.84 per square foot.

Combined sued Equitable for breach of the lease agreement. The jury found for Combined and awarded damages of $259,-163.67: $8,332.50 for architect's fees; $64,-684.17 for the aborted renovation work; and $186,147.00 for rental damages, the difference between rent at Gateway III and Hartford Plaza. The district court entered judgment for $259,163.67. Equitable has appealed. It raises five arguments. First, it claims that the Statute of Frauds should prevent enforcement of the lease. Second, it asserts that Combined may only recover restitution and not breach of contract damages. Third, it asserts that Combined failed to prove equitable estoppel. Fourth, it claims that the district court erred in allowing proof of damages with a disputed invoice. Fifth, Equitable maintains that the awarded rent damages are excessive. For the reasons discussed below, we affirm the jury's determination of liability but remand for recalculation of damages.

## I. Liability

### A. Statute of Frauds

■ Equitable complains that because it never signed the lease its enforcement should be barred by the Statute of Frauds. Equitable further asserts that both the lease and the agent's authority to represent a document as signed must be in writing. Equitable fails to recognize that Illinois law disallows the defense of the Statute of Frauds when the party to be charged with a contract has misrepresented a material fact, causing detrimental reliance. *Ozier v. Haines*, 411 Ill. 160, 103 N.E.2d 485 (1952). Furthermore, Tishman had the apparent, if not actual, authority to represent the document as signed.

The Statute of Frauds, Ill.Rev.Stat. ch. 59, ¶ 2, bars the enforcement of a contract but does not affect its validity. *Shugan v. Colonial View Manor*, 107 Ill.App.3d 458, 63 Ill.Dec. 82, 437 N.E.2d 731 (1982). In the case before us, defendant's agent, Tishman, represented to Combined that the lease contract had been signed. The cases

cited by the defendant are distinguishable because they involve situations in which both parties were aware that there was no signed agreement.[1] See *Uden v. Patterson*, 252 Ill. 335, 339, 96 N.E. 852 (1911); *Uscian v. Blacconeri*, 35 Ill.App.3d 80, 85, 340 N.E.2d 618 (1975). False assertion to a tenant that a lease is signed is different from an agreement to be bound by an oral lease. Equitable estoppel may thus prevent the defendant from asserting the Statute of Frauds defense to bar enforcement of the lease agreement.

Insofar as defendant attempts to challenge the authority of Tishman to make such a misrepresentation, they are confronted with a jury instruction to which they did not object. See *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260, 1268 (7th Cir.1986). Instruction 9.5 informed the jury that Tishman was Equitable's agent, and that any act or omission of Tishman was the act or omission of Equitable. Furthermore, the facts bear out this agency relationship. Combined dealt only with Tishman during all lease negotiations. In its Real Estate Management Agreement, Equitable gave Tishman complete authority for the negotiations of lease agreements at Gateway III except for final approval and signature. Combined's only source of information about any of Equitable's activities was through Tishman. Therefore Tishman's statement that Equitable had signed the lease was by a duly authorized agent. *Wargel v. First Nat'l Bank of Harrisburg*, 121 Ill.App.3d 730, 77 Ill.Dec. 275, 460 N.E.2d 331 (1984); *Schoenberger v. Chicago Transit Authority*, 84 Ill. App.3d 1132, 39 Ill.Dec. 941, 405 N.E.2d 1076 (1980).

■ Equitable next contends that the Statute of Frauds requires that the authority of an agent to represent that its principal has signed a lease must be in writing. The language of the statute makes no such requirement. The statute states that the contract must be in writing "signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party." Ill.Rev.Stat. ch. 59, ¶ 2. The cases cited by Equitable are inapplicable because they all involve situations where the agent actually signed the documents. See, *e.g.*, *McMillan v. Ingolia*, 87 Ill.App.3d 727, 43 Ill.Dec. 162, 410 N.E.2d 162 (1980). Here Tishman did not attempt to sign the lease agreement for Equitable. It merely represented that Equitable had signed the lease. The Statute of Frauds does not bar enforcement based on such a representation.

### B. Equitable Estoppel

■ Defendant further claims that the misrepresentation of an agent will not support a claim of equitable estoppel against the principal absent knowledge or ratification of the principal. Defendant also claims that such misrepresentation must be proven by clear and convincing evidence, and that Combined cannot demonstrate an equitable estoppel because it did not reasonably rely on Tishman's representations.

According to defendant, in order to be liable for its agent's misrepresentations it must either have knowledge of or ratify the statement. That is simply not the law. *Handelman v. Arquilla*, 407 Ill. 552, 95 N.E.2d 910 (1950); Restatement of Agency §§ 161, 257, 258. The supporting cases cited by Equitable are factually distinct from the present situation. In both *Cosmopolitan Nat'l Bank v. Kobialka*, 85 Ill. App.3d 1, 40 Ill.Dec. 449, 406 N.E.2d 150 (1980), and *Estate of Boysen*, 73 Ill.App.2d 197, 218 N.E.2d 838 (1966), the agents had no authority to make the representation. Such is not the case here. For the principals to be responsible for the assertion, they must have either known of or ratified the agent's statements. In Part I.A. we concluded that Tishman did have the authority to represent that Equitable had executed the lease. Once an agent has either actual or apparent authority to act for a principal, the principal is bound by those

---

**1.** Other cases cited by defendant are inapplicable because they discuss promissory estoppel, not equitable estoppel. See *Libby-Broadway*

*Drive-In, Inc. v. McDonald's Systems, Inc.*, 72 Ill.App.3d 806, 810, 28 Ill.Dec. 802, 391 N.E.2d 1 (1979).

acts. *St. Ann's Home For the Aged v. Daniels*, 95 Ill.App.3d 576, 51 Ill.Dec. 64, 420 N.E.2d 478 (1981) (principal bound not only for expressly authorized acts but also for whatever is necessary to performance); *Roscoe Co. v. Lewis University*, 79 Ill. App.3d 1098, 35 Ill.Dec. 133, 398 N.E.2d 1083 (1979) (principal bound where agent had inherent power arising out of the agency relationship).

Next Equitable argues that the district court erred in instructing the jury that Combined had to prove misrepresentation by a preponderance rather than by clear and convincing evidence. In support of its argument Equitable analogizes to part performance, promissory estoppel, and fraud doctrines. None is controlling. The first two doctrines are inapplicable because equitable estoppel requires proof of misrepresentation. Fraud, which must be proved by clear and convincing evidence, *Ray v. Winter*, 67 Ill.2d 296, 10 Ill.Dec. 225, 367 N.E.2d 678 (1977), differs in that it requires proof of an intent to harm. *Northern Trust Co. v. Oxford Speaker Co.*, 109 Ill. App.3d 433, 65 Ill.Dec. 113, 440 N.E.2d 968 (1982). Thus a higher burden is required in fraud cases to reduce the risk of tarnished reputations. See *Board of Education v. State Bd. of Education*, 113 Ill.2d 173, 100 Ill.Dec. 715, 497 N.E.2d 984 (1986).

Illinois courts have not established the burden of proof to be required in equitable estoppel cases. Other jurisdictions differ on whether a preponderance of the evidence will suffice to prove equitable estoppel or if clear and convincing evidence is required. Compare *New York C.R. Co. v. General Motors Corp.*, 182 F.Supp. 273 (N.D. Ohio 1960); *Ricks v. Teslow Consol.*, 162 Mont. 469, 512 P.2d 1304 (1973); *Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982); *Gitter v. Tennessee Farmers Mutual Ins. Co.*, 60 Tenn.App. 698, 450 S.W.2d 780 (1969); *Ybanez v. Anchor Const., Inc.*, 489 S.W.2d 730 (Tex.Civ.App. 1972); *State v. Green Bay*, 96 Wis.2d 195, 291 N.W.2d 508 (1980) with *Citizens Savings Bank v. Sac City State Bank*, 315 N.W.2d 20 (Iowa 1982); *Chemical Bank v. Washington Public Power Supply System*, 102 Wash.2d 874, 691 P.2d 524 (1984) (against local governmental bodies); *Variance, Inc. v. Losinske*, 71 Wis.2d 31, 237 N.W.2d 22 (1976); *Kincheloe v. Milatzo*, 678 P.2d 855 (Wyo.1984) (fraudulent misrepresentation). Illinois has addressed the issue only with respect to proof necessary in child custody and support cases where the nature of the dispute requires additional assurances of a correct result. See *Elliott v. Elliott*, 137 Ill.App.3d 277, 91 Ill. Dec. 923, 484 N.E.2d 482 (1985); *Ruster v. Ruster*, 91 Ill.App.3d 355, 46 Ill.Dec. 874, 414 N.E.2d 927 (1980); *In re Marriage of Strand*, 86 Ill.App.3d 827, 42 Ill.Dec. 37, 408 N.E.2d 415 (1980). Given the split of authority in other jurisdictions, the lack of clear authority in Illinois, and the reasoning for imposing higher burdens in fraud cases and child support and custody, we agree with the district court's ruling that a preponderance of the evidence was the appropriate standard.

Finally, defendant argues that Combined did not reasonably rely on the misrepresentations of its agent, Tishman. Equitable points to two facts that should have alerted Combined that there was no signed agreement: first, the February 18 attempt to have Goodman and Richer personally guarantee the loans and second, the work stoppage on February 24. In fact, argues Equitable, it was Combined's insistence that the remodeling work begin again (under threats of lawsuit) that caused them the greatest damage.

Equitable misconstrues the whole picture of facts that had been presented to the jury. According to Goodman, when Miller called on February 8, he expressed great embarrassment for having to relay Equitable's desire to change the terms of the deal. And on February 25 when again speaking with Goodman, Miller told him that they were proceeding under their earlier agreement (the allegedly signed lease). During neither discussion did Miller attempt to correct Goodman's assumption that they were operating under a signed lease agreement. Other than speculative suspicions, there is nothing in the record

that should have given Goodman reason to doubt the earlier representation that Equitable had signed the lease. There was nothing unreasonable about Combined's attempt to cooperate with Equitable.

## II. Damages

### A. Measure of Damages

 The district court instructed the jury that the measure of damages was the difference in value between the market value of the leasehold property and the rent payable under the lease. The jury calculated the rent damages to be $186,147. Equitable claims that the correct measure of damages under the theory of equitable estoppel is out-of-pocket expenses or reliance damages.

Defendant's argument is that Combined's remedy should be limited to the expenses it incurred under the lease. Under this theory, Combined's recovery would be limited to the funds expended for remodeling and demolition work in reliance on Tishman's representations. See Restatement (Second) of Contracts § 129 comment c, § 139 (1979). Defendant agrees that the correct measure of damages for a breach of lease contract is the difference in value between the rent fixed in the lease and the fair rental value of the leased property. See Friedman on Leases § 34.7.

Defendant's argument fails to recognize that once equitable estoppel was proven, plaintiff had a binding oral agreement that defendant breached. Combined is entitled to recover the damages that flow directly from that breach. See 31 C.J.S. *Estoppel* § 148 (estoppel operates to put the party entitled to its benefit in the same position as if the thing represented were true). In other words, Combined is recovering for breach of the lease agreement, not for equitable estoppel. The facts of this case are not analogous to situations in which equity operates to prevent an unjust result even though the Statute of Frauds would bar enforcement of the contract. Here Equitable through its agent Tishman represented to Combined that the agreement was signed. Under these circumstances Combined is entitled to recover direct damages for breach of the lease agreement.

See 3 Williston on Contracts § 533A, at 741–742 (3d ed. 1960).

### B. Disputed Invoice

 The defendant claims that it was error for the district court to allow a disputed invoice to be used for purposes of calculating damages. Equitable also contends that the district court erred in refusing to admit evidence of a lawsuit brought against Combined relating to the disputed invoice. The judge ruled correctly on both issues.

The defendant waived its first objection by not raising it until its motion for a directed verdict. Equitable did not object to the invoice's initial admission. In fact, Equitable used the invoice to impeach Goodman directly on the issue of whether the bill had been paid. Equitable counters by stating that there was no reason to object because the invoice was admissible for the limited purpose of showing that Combined acted in reliance on Tishman's representations. But if its use was limited to that purpose for the plaintiff, it was also so limited for Equitable. Because Equitable itself used the invoice beyond its relevant purposes, it cannot now complain that the disputed evidence was considered by the jury.

 Equitable also asserts that the district court erred when it excluded evidence of a lawsuit filed by Continental Electrical Construction Company (Continental) for $23,065.29 of the $63,238.04 claimed by Interior Alterations. That suit had been dismissed for want of prosecution on September 7, 1984. The district court was correct in concluding that Continental's suit was irrelevant to the suit between Equitable and Combined. The dismissal for want of prosecution is not an adjudication on the merits. Because the dismissal has no legal effect on Interior Alteration's claim against Combined, the district court did not abuse its discretion in excluding the evidence.

### C. Calculation of Damages

 Defendant claims that the jury erred in failing to consider the interest rate on the loan Combined sought to pay for

improvements on the leasehold. A jury's award of damages will be upheld unless clearly excessive. *Davis v. Consolidated Rail Corp.*, 788 F.2d 1260 (7th Cir.1986); *In re Innovative Construction Systems, Inc.*, 793 F.2d 875, 887 (7th Cir.1986). However, a trier of fact may not award damages on the basis of conjecture or guesswork. *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 991 (7th Cir.1976); *Alover Dists., Inc. v. Kroger Co.*, 513 F.2d 1137, 1140–1141 (7th Cir.1975). We review the district court's denial of the motion for a new trial for abuse of discretion. *Joan W. v. City of Chicago*, 771 F.2d 1020, 1023 (7th Cir.1985); *United States v. Bruscino*, 687 F.2d 938, 940–941 (7th Cir.1982). Although the damages need not be proven with mathematical certainty, they must reasonably approximate the actual damages suffered. *Bailey*, 535 F.2d at 991; *Alover*, 513 F.2d at 1141. We have reviewed the damages calculation and conclude that the award was excessive. Therefore, we reverse and remand for a new trial on the damages issue.

### 1. Interest

Defendants claim that the jury failed to take into account the 17% interest on the tenant improvement loan when calculating the rental damages. Because the jury returned only a general damages verdict (and neither party requested otherwise) we must analyze that figure to determine whether the awarded damages are within the realm of reason.

The jury should have taken into account Combined's cost of using the $250,000, which would have carried 17% interest. The interest rate represents the market price for using someone else's money. The cost of borrowing the money is significant evidence of the value to Combined of the improvements and the true rental space value. Combined received a benefit when it borrowed the $250,000 rather than using its own assets. By borrowing the improvement funds, Combined freed $250,000 of its own assets for other investment purposes. The value of that opportunity to invest is the 17% interest rate. When comparing the two leases, the jury should have valued

the interest payment, just as it should have attempted to value location, view, floor space, and other amenities. If interest is ignored, it is as though the plaintiff received the use of $250,000 free. To fail to take into account the interest is as ridiculous as failing to take into account the cost of the renovation work itself. They are both a cost of making the two premises comparable.

The only calculations presented to the jury were made by Eugene Ross, plaintiff's expert. Ross did not calculate the interest payments in his analysis of the value of the two properties. Instead, for the Gateway III lease, he simply divided the loan amount ($250,000) by the square footage (18,500) and then added this amount to the rental price of $14.50 per square foot. This brought the annual square footage payments to $15.84 per square foot. He then subtracted that amount from the annual square foot payment for the Hartford lease ($17.64) and came up with a difference of $1.80 per square foot, or $33,300 per year, or $333,000 for the 10–year term of the lease. Ross did not examine the income stream over the 10–year lease term of either lease, nor did he analyze the differences through present value calculations. The defendant did not introduce its own method of calculating the appropriate damages, but instead argued to the jurors that they should take into account the fact that Combined would have to pay interest on its loan obligation.

If the total cash flow per month under both arrangements is calculated, the two leases can be compared in order to determine which was a better value and by how much. Then the total cash paid over the 10 years must be brought to present value and the two resulting figures compared. Calculating the loan payment, with interest, separately from the monthly rental payment, then adding the two together, permits discovery of how the interest rate will affect the total cash exchange.

The $250,000 loan for tenant improvements that Equitable agreed to make to Combined was to be repaid over the 10–year term of the lease.

| Lease | Square Feet | Price per Square Foot | Monthly Payment | Total Payment Over 10 Years |
|---|---|---|---|---|
| Hartford | 18,500 | $17.64/yr | $27,195 | $32,634,000 |
| Gateway III | 18,500 | $14.50/yr | $22,354 | $26,825,000 |

The total dollars paid by the lessee under the two leases and the loan payment are as follows: [2]

| | Cost | Total Payments (10 Years) | Monthly Payments |
|---|---|---|---|
| Hartford | $17.64/sq ft | $32,634,000 | $27,195 |
| Gateway III | $14.50/sq ft | $26,825,000 | $22,354 |
| Loan ($250,000) | (17% interest) | $ 520,000 | $ 4,334 |

The present value of the total cash payments is as follows: [3]

| | 10% | 12% | 14% | 16% |
|---|---|---|---|---|
| Hartford lease | $2,061,330.80 | $1,895,505.70 | $1,751,234.13 | $1,625,873.55 |
| Gateway III lease | $1,694,391.93 | $1,558,085.47 | $1,439,495.78 | $1,336,450.72 |
| loan | $ 328,509.20 | $ 302,082.06 | $ 279,089.86 | $ 259,111.45 |
| Total Gateway III | $2,022,901.13 | $1,860,167.53 | $1,718,585.64 | $1,595,562.17 |

The differences between the present value of the two leases are:

| 10% | 12% | 14% | 16% |
|---|---|---|---|
| $38,429.67 | $35,338.17 | $32,648.49 | $30,311.38 |

Using the appropriate calculation method and incorporating the cost of borrowing the $250,000 for the tenant improvements, the range of damages should have been approximately between $30,000 to $40,000. The $186,000 award is, therefore, clearly excessive. A remand for a new trial is necessary for the limited purpose of recalculating Combined's rental damages.

The $259,163.67 judgment for plaintiff is vacated and the cause is remanded solely for recalculating Combined's rental damages. Circuit Rule 18 shall not apply.

2. All of the numbers are approximate and for purposes of example only. The calculations assume 18,500 square feet of lease space for both premises and equal monthly payments over a 10–year period lease. The loan assumes a 17% simple rate of interest, with equal monthly payments over a 10–year period.

3. The present value was calculated using the following formula:

$$PV = \frac{C}{r} \left[ 1 - \frac{1}{(1 + r)^n} \right]$$

PV = present value r = discount rate
C = periodic payment n = periods

R. Brealey & S. Myers, Principles of Corporate Finance 31–33 (2d ed. 1984). Variable interest rates were used to calculate present value because no evidence was presented at trial by either side to indicate what the appropriate discount rate was for the Chicago market in 1982.