**In re S.N.A. NUT COMPANY, Debtor.**

**S.N.A. NUT COMPANY, Plaintiff,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant.**

**Bankruptcy No. 94 B 5993.**
**Adversary No. 95 A 00705.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

June 26, 1997.

As Corrected Aug. 25, 1997.

Thomas B. Orlando, Chicago, IL, for Movant.

James D. Benak, Chicago, IL, for Respondent.

## MEMORANDUM OPINION AND ORDER

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the motion of National Union Fire Insurance Co. ("National Union"), the defendant, for partial summary judgment on Count I of the First Amended Complaint for Declaratory Judgment and Breach of Contract (the "Complaint"), filed by S.N.A. Nut Company (the "Debtor"). Count I of the Debtor's Complaint alleges that National Union wrongly refused to provide coverage for the business interruption loss sustained by the Debtor in one of its nut processing plants, and seeks declaratory judgment that the insurance policy provides coverage for the Debtor's loss which is alleged to be in the amount of at least $2,540,216 ($500,000 representing net profit which was prevented from being earned and $2,040,216 representing all continuing expenses during the loss period). National Union, in support of its motion, argues that the Debtor cannot prove that it incurred and paid continuing expenses in the amount of $2,040,216, and therefore, no issue of fact remains as to whether, under the policy, the Debtor is entitled to compensation for that portion of its business interruption loss. Upon review of both parties briefs and upon hearing oral arguments from the parties, for the reasons set forth herein, this Court finds that whether the Debtor can substantiate its continuing expenses loss is a factual questions to be determined at trial. Accordingly, National Union's motion is denied.

## BACKGROUND

The Debtor sustained a fire loss due to a fire in a pecan dryer at the Debtor's Mansfield, Louisiana facility. National Union, the Debtor's insurer, reimbursed the Debtor for damage to the pecan dryer and for related fire damage to real and personal property at the Mansfield facility. The fire interrupted the Debtor's business so that it was unable to process nuts at the Mansfield plant from October 22, 1992 through early 1993.

The Debtor had business interruption insurance with National Union. On September 3, 1993, the Debtor made a claim for its business interruption loss for the time the Mansfield facility lay idle. Calculating its loss using the gross earnings method, the Debtor submitted a claim in the amount of at least $2,540,216, of which $500,000 represent-

ed lost net profits and $2,040,216 represented necessarily incurred continuing expenses.

On October 21, 1993, in a letter written by adjuster, James Terlecki, National Union denied the Debtor's claim in its entirety. On or about March 14, 1994, National Union filed suit in the Western District of Louisiana seeking a declaration that it was not liable to the Debtor for the claimed loss from the Mansfield fire. In the Louisiana Complaint, National Union stated two reasons for denying coverage: (1) that the Debtor equated lost production with lost sales; and (2) that the Debtor allegedly mitigated its loss with inventory on hand.

On June 1, 1995, the Debtor narrowed its claim for business interruption to the core period of its loss, from October 22, 1992 through December 31, 1992. The Debtor defines this time period as its "buy-shell-sell" season, the time of year when, historically, it sells every nut it processes, arguably making the Debtor's production capacity equal to its lost sales. Like the September 1993 formulation of the Debtor's claim, the June demand was calculated by the gross earnings method. After a brief time in which the Debtor did not receive a response from National Union, the Debtor filed this action on June 19, 1995, seeking payment for its loss.

## JURISDICTION

■ This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and General Rule 2.33.A of the United States District Court for the Northern District of Illinois.[1] § 1334(b) states that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[2] Bankruptcy Judges can enter final orders in "core" proceedings arising under title 11 pursuant to 28 U.S.C. § 157(b)(2), or submit proposed findings of fact and conclusions of law to the District Court in "noncore" proceedings which are "otherwise related to" a case under title 11 pursuant to § 157(c)(1).

In general, a proceeding "relates to" a bankruptcy if it affects the amount of property to be distributed or allocated among creditors. *In re Xonics,* 813 F.2d 127, 131 (7th Cir.1987). The present case is "related to" the Debtor's bankruptcy proceeding under title 11 because it concerns the Debtor's interest, if any, in an insurance policy issued by National Union. *See UNR Industries, Inc. v. Continental Casualty Co.,* 942 F.2d 1101, 1103 (7th Cir.1991), *cert. denied,* 503 U.S. 971, 112 S.Ct. 1586, 118 L.Ed.2d 305 (1992) (District Court had jurisdiction to hear a dispute between the debtor asbestos company against its insurer regarding the debtor's rights under its policy.) The scope of the Debtor's interest "affects the amount of property available for distribution," establishing the District Court's jurisdiction.

## DISCUSSION

### (a) Partial Summary Judgment and Rule 7056(d)

The purpose for granting a summary judgment motion under Federal Rule of Civil Procedure 56 (adopted by Federal Rule of Bankruptcy Procedure 7056), is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Division,* 832 F.2d 374, 378 (7th Cir.1987); *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Assoc. of Indianapolis,* 806 F.2d 146, 149 (7th Cir.1986). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elect. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir.1990). The burden is on the moving party to show that

---

1. General Rule 2.33(A) provides a blanket referral for all bankruptcy cases to the Bankruptcy Judges in this District.

2. All references to "title 11" herein refer to the Bankruptcy Code of 1978 as amended from time to time.

there is no such factual dispute. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *In re Chicago, Missouri & Western Ry. Co.,* 156 B.R. 567 (Bankr.N.D.Ill.1993). This burden is met when the record, as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

Once the movant makes a prima facie showing that it is entitled to judgment as a matter of law, the respondent must show that there is a genuine issue and may not rest upon pleadings, allegations or denials in its pleadings. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. All inferences to be drawn from underlying facts must be viewed in the light most favorable to the respondent. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Karazanos v. Navistar Int'l. Transp. Corp.,* 948 F.2d 332, 335 (7th Cir. 1991).

Although cast as a Motion for Partial Summary Judgment, National Union's motion is governed by Fed.R.Civ.P. 56(d), as applied through Fed. R. Bankr.P. 9014 and 7056(d), because it does not lead to a judgment on a complete count of the entire case, but only terminates further contest on a portion of the litigation. Rule 7056(d) provides:

If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just.

Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Fed. R. Bank. P. 7056(d). Pursuant to Rule 7056(d), in an effort to ascertain if any controverted material facts exist, this Court examined the pleadings and the evidence before it and interrogated counsel at a hearing conducted on March 5, 1997.

Partial summary judgment is available only to dispose of one or more counts of a complaint in their entirety. *Commonwealth Ins. Co. v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201 (7th Cir.1959); *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28 (N.D.Ill.1985). However, an order that is interlocutory and in the nature of a pretrial order may be entered to help frame and narrow the triable issues. *Capitol Records,* 106 F.R.D. at 28–29; *In re Farley,* 146 B.R. 739, 743 (Bankr. N.D.Ill.1992); *See also, Archer–Daniels–Midland Co. v. Phoenix Assurance Co.,* 936 F.Supp. 534, 537 (S.D.Ill.1996). Therefore, although partial summary judgment cannot be entered here, this Court will consider whether the entry of an interlocutory order is appropriate to address the issues that arise.

### (b) Issues Framed by the Parties

National Union, in support of its motion for partial summary judgment, argues that the Debtor cannot prove that it actually incurred and paid continuing expenses in the total amount of $2,040,216, and therefore, no issue of fact remains as to whether under the policy the Debtor is entitled to compensation for that portion of its business interruption loss.

The Debtor argues that National Union's argument fails as a matter of law for several reasons. First, the policy permits calculation of loss using the gross earnings method and the Debtor has applied the gross earnings method correctly. Second, National Union's adjustment of other claims under the same policy language demonstrates that the policy permits the Debtor's method of calculating its business interruption loss. And, third, the doctrine of "mend the hold" estops National Union from raising new and different

grounds for coverage denial upon which the motion rests.

This Court finds that this case is not about methodology; both the gross earnings method and net profit method for calculating business interruption loss, when applied correctly, yield similar results. The only issue before the Court is whether the Debtor can provide evidence to support its loss. The Debtor will not survive this motion unless it can support its continuing expenses claim with business records and witnesses that can testify to the accuracy of the records.

■ As to the other issues raised by the Debtor, this Court finds that National Union's treatment of other company's business losses is not relevant to this case in that methodology is not at issue; and, the "mend the hold" doctrine is not applicable to the initial pleading stage of litigation so as to prevent a party from freely amending its pleadings. *See Apex Automotive Warehouse, L.P. v. WSR Corporation,* 205 B.R. 547 (Bankr.N.D.Ill.1997).

### (c) Coverage under the Insurance Policy

To recover under an "all-risk" insurance policy, such as the policy at issue, the Debtor must demonstrate that a loss has occurred and that the loss was caused by a fortuitous event. *Harbor House Condominium Assoc. v. Massachusetts Bay Ins. Co.,* 915 F.2d 316, 318 (7th Cir.1990) (citations omitted). The Debtor must also prove the "nature, extent or amount of [its] loss to a reasonable degree of certainty before any award of damages can be made under the policy." *Id. citing S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co.,* 695 F.2d 253, 261 (7th Cir.1982); *Hoefferle Truck Sales, Inc. v. Divco–Wayne Corp.,* 523 F.2d 543, 553 (7th Cir. 1975); *Alover Distributors, Inc. v. Kroger Co.,* 513 F.2d 1137, 1140–41 (7th Cir.1975); *Finer Amusements, Inc. v. Citizens Ins. Co. of New Jersey,* 327 F.2d 773, 776 (7th Cir. 1964); *DMI, Inc. v. Country Mutual Ins. Co.,* 82 Ill.App.3d 113, 115, 37 Ill.Dec. 803, 805, 402 N.E.2d 805, 807 (3rd Dist.1980). Otherwise, indemnifying the insured for a

loss that has not been sufficiently documented would provide a windfall profit for the insured. *Cohen Furniture Co. v. St. Paul Ins. Co.,* 214 Ill.App.3d 408, 415, 158 Ill.Dec. 38, 42, 573 N.E.2d 851, 855, (App.Ct.Ill.1991). Damages need not be proven to a "mathematical certainty," however, the Debtor cannot rely on "mere speculation or conjecture." *S.C. Johnson & Son, Inc.,* 695 F.2d at 261; *Hoefferle Truck Sales, Inc.,* 523 F.2d at 553; *Alover Distributors, Inc.,* 513 F.2d at 1140–41; *DMI, Inc.,* 37 Ill.Dec. at 805, 402 N.E.2d at 807.

■ The parties concur that a fortuitous event had occurred. The Debtor must now sufficiently prove the "nature, extent or amount of [its] loss" to withstand National Union's motion for partial summary judgment.

### (d) Calculation of a Business Interruption Loss

The Debtor's insurance policy pays the insured for its "actual loss sustained." The policy defines an "actual loss sustained" as follows:

> If such [business interruption] loss occurs during the term of this policy, it shall be adjusted on the basis of the actual loss sustained by the Insured, consisting of the net profit which is thereby prevented from being earned and of all charges and expenses (excluding ordinary payroll), but only to the extent that they must necessarily continue during the interruption of business, and only to the extent to which they would have been earned had no loss occurred.

Actual loss can be calculated by using either the "net profit" or the "gross earnings" method. The net profit method [3] calculates loss by adding an insured's continuing expenses (expenses that must be paid notwithstanding the interruption of the business) to the amount of the insured's estimated net profit which was prevented from being earned (lost profit) during the period the business was closed. The sum equals the

---

**3.** The language of the policy requires that actual loss sustained be calculated by adding net profit prevented from being earned to all charges and

expenses that must necessarily continue during the interruption of the business.

insured's actual loss sustained. The gross earnings method calculates actual loss by subtracting the insured's non-continuing expenses (expenses that were saved by the interruption of the business), from the its estimated gross earnings (lost earnings), which were prevented from being earned by the interruption of the loss. Either method, applied correctly, should give equivalent accurate loss measurements. David A. Borghesi, *Business Interruption Insurance—A Business Perspective,* 17 Nova L.R. 1147, 1153–1156 (1993).[4]

The Debtor calculated its loss under the gross earnings method. Accordingly, the Debtor must provide a basis for the lost earnings and the continuing expenses paid during the period of business interruption, October 22, 1992 through December 31, 1992. Continuing expenses (also known as "fixed expenses") may include, fixed salaries and wages, fixed heat, light and power, fixed property taxes, fixed transportation, fixed warehousing, fixed insurance costs, legal costs, rent, interest, advertising, licenses, printing and postage, telephone and bank charges. *See A & S Corp. v. Centennial Ins. Co.,* 242 F.Supp. 584, 588 (N.D.Ill.1965).

### (e) Use of a Summary Exhibit

In support of its claim, the Debtor submitted to National Union a schedule of its business interruption loss, which has come to be known in these proceedings as "Schedule D." Schedule D is a summary exhibit of the Debtor's calculations of its lost sales, lost production, cost of goods sold, direct labor overhead,[5] projected labor overhead and cost of processing at the Debtor's Illinois plant during the loss period. National Union rejected Schedule D as proof of the Debtor's actual loss because it was devoid of identification or analysis of the fixed expenses and did not substantiate that the amounts calculated were accurate and actually incurred and paid. National Union further argued

that the Debtor presented no other evidence of its continuing charges.

The use of a summary exhibit is governed by Federal Rule of Evidence 1006 which provides:

> [t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. The purpose of this rule is to simplify the presentation of data based on voluminous records. *United States v. Briscoe,* 896 F.2d 1476, 1495 (7th Cir.1990), cert. denied 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137. In order to admit a summary exhibit, the proponent must lay a proper foundation that the summarized material is itself admissible and that the summary is accurate. *Needham v. White Laboratories,* 639 F.2d 394, 403 (7th Cir.1981), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 237; *Pritchard v. Liggett & Myers Tobacco Co.,* 295 F.2d 292, 301 (3d Cir.1961).

### (f) Debtor's Evidence—Schedule D

In written interrogatory No.21, National Union had asked the Debtor to identify "all persons either responsible for the claim and/or proof of loss calculation or with knowledge of the claim and/or sworn proof of loss calculation, or any part thereof." In response, the Debtor stated that Ralph DeLetto, Curtis Johnson and DeLoitte & Touche were responsible for preparing the September 3, 1993 claim and Curtis Johnson and Dempsey Myers & Company were responsible for preparing the June 1, 1995 claim, also known as Schedule D. Pursuant to the Debtor's response, National Union took the depo-

---

**4.** A description and illustration of the two methods, as described by William Metzdorff, Debtor's Witness (Exhibit A to Plaintiff S.N.A. Nut Company's Memorandum in Response to National Union's Motion for Summary Judgment), is excerpted as Appendix A to this opinion.

**5.** This summary included the following expenses: direct labor, packaging materials, repairs and maintenance, utilities, shop supplies, freight out, laundry, insecticides, employee housing, garbage disposal, telephone. The Debtor outlined direct labor overhead costs for the years 1989–1993, including a two-year average for the overhead costs in 1991 and 1992.

sitions of Ralph DeLetto, Curtis Johnson, William O'Connell (DeLoitte & Touche), William Metzdorff (Dempsey Myers & Company), Sam DiGregorio, Nick DiGregorio (President and Vice–President of S.N.A. Nut Company in 1992 respectively), and Thomas Dalton (current responsible party for the Debtor).

According to the testimonies, Mr. DeLetto, the Debtor's chief financial officer in 1992, was responsible for determining the insurance claim amount, Mr. Johnson, the Debtor's controller in 1992, was responsible for accumulating data for National Union's interrogatories from the Debtor's business records and submitting the figures to Mr. Metzdorff, the Debtor's expert witness, and Metzdorff, based on the data submitted to him, created Schedule D. The remaining witnesses either had no knowledge or limited knowledge regarding the information contained in Schedule D. None of those witnesses could testify with any specificity as to any data or records which constituted the basis for the summary exhibit which is Schedule D.

Mr. Metzdorff testified that the analysis of direct labor overhead included listings of both continuing and non-continuing expenses and that the sum total of the Debtor's labor overhead was not representative of its non-continuing costs alone. Mr. Johnson, could not testify as to the underlying data. He had no personal knowledge as to the accuracy of any of the figures contained in Schedule D. He was, however, the person who extracted the appropriate information from the files and business records of the Debtor. At the time of his deposition, he was the controller in charge of the Debtor's business records. Sam and Nick DiGregorio both testified that they "assumed" that Schedule D was representative of the Debtor's books and that they "assumed" the Debtor's books and records were accurate, but neither were the record keepers nor had actual knowledge of the data preparation. Sam testified as to the type of expenses incurred by the Louisiana facility, but could not testify as to whether any expenses were in fact incurred. Sam further stated that Mr. DeLetto was mostly responsible for determining the insurance claim

amount. Mr. Dalton testified that he had no specific knowledge as to whether the documents submitted to National Union in support of the Debtor's claim, were prepared in the ordinary course of business, as he was not employed by the Debtor in 1992. Mr. DeLetto, who would have been the employee in charge of the company's records and therefore, the one expected to have the requisite knowledge, invoked his Fifth Amendment privilege against self-incrimination in response to every question regarding Schedule D. No one else has been identified by the Debtor in place of Mr. DeLetto.

National Union claims that it has, by the use of discovery, eliminated every possibility that the Debtor could substantiate its claim. A review of the discovery results submitted in support of National Union's motion reflects otherwise.

Schedule D is the result of Metzdorff's analysis. Metzdorff relied on Curtis Johnson's figures. Johnson relied on the business records of the Debtor. Johnson was never asked, in his deposition, to identify the specific source records. No interrogatory was submitted seeking that specific document identification. National Union did request

[a]ll documents supporting, relating to, pertaining to, explaining, identifying or otherwise forming a part of any and all claims and sworn proofs of loss, including the June 1, 1995 claim, submitted by S.N.A. to National Union pursuant to the October 23, 1992 fire loss at the Mansfield, Louisiana location.

*See,* National Union Document Request # 13. The Debtor responded as follows:

The working files of William Metzdorff will be produced. These documents were previously provided to National Union and are bates stamped DM000001–DM003025.

Other than Schedule D, which is encompassed within this document request, no other documents have been submitted to this Court. National Union has argued that the Debtor has failed to substantiate its continuing expenses claim. Absent the documents utilized by Johnson, whether the Debtor can

substantiate its claim is a factual issue that will have to remain for trial. National Union's motion will, therefore, be denied.

## CONCLUSION

For the foregoing reasons, National Union's motion for partial summary judgment is denied.

### Appendix A

### Excerpts from Deposition of William Metzdorff

Under the net profit method of evaluating the [business interruption] loss, the actual loss sustained is calculated by estimating the expenses that continued notwithstanding the interruption of the business and which would have been earned had no loss occurred (sometimes referred to as "continuing expenses" or "fixed expenses"), and adding that estimate to an estimate of the net profit which was prevented from being earned by the interruption of business. Two simple examples using the net profit method to calculate the actual loss sustained (in a profit and no profit scenario) are shown below:

[See attached "Chart 1"]

Under the gross earnings method of evaluating the [business interruption] loss, the actual loss sustained is calculated by subtracting the estimated expenses that were saved by the interruption of the business (sometimes referred to as "non-continuing expenses") from the estimated net sales which were prevented from being earned by the interruption of the business. The difference is the expenses that continued notwithstanding the interruption of the business and which would have been earned had no loss occurred, and to the extent the net revenues that were prevented from being earned would have covered all continuing and non-continuing expenses, net profit. By definition, this number is equivalent to net profit plus continuing expenses. Two simple examples using the gross earnings method to calculate the actual loss sustained (in a profit and no profit scenario) are shown below:

[See attached "Chart 2"]

### "Chart 1"

### NET PROFIT

**Company Would Have Earned Profit Scenario**

| Description | Per Unit/ Percent | Amount |
|---|---|---|
| Lost Sales In Units | | 16 |
| Lost Net Sales Value | $5.00 | $80.00 |
| Continuing Expenses (Earned) | 20% | $16.00 |
| Lost Net Profit (Earned) | 8% | $6.40 |
| Actual Loss Sustained | | $22.40 |

**Company Would NOT Have Earned Profit Scenario**

| Description | Per Unit/ Percent | Amount |
|---|---|---|
| Lost Sales In Units | | 8 |
| Lost Net Sales Value | $5.00 | $40.00 |
| Continuing Expenses (Earned) | 33% | $13.20 |
| Saved Net Loss (Earned) | −5% | ($2.00) |
| Actual Loss Sustain | | $11.20 |

### "Chart 2"

### GROSS EARNINGS METHOD

**Company Would Have Earned Profit Scenario**

| Description | Per Unit | Amount |
|---|---|---|
| Lost Sales in Units | | 16 |
| Lost Net Sales Value | $5.00 | $80.00 |
| Saved Expenses | $3.00 | ($48.00) |
| Lost Gross Earnings | | $32.00 |
| Saved Non–Continuing Expenses | $0.60 | ($9.60) |
| Actual Loss Sustain | | $22.40 |

**Company Would <u>NOT</u> Have Earned Profit Scenario**

| Description | Per Unit | Amount |
|---|---|---|
| Lost Sales in Units | | 8 |
| Lost Net Sales Value | $5.00 | $40.00 |
| Saved Expenses | $3.00 | ($24.00) |
| Lost Gross Earnings | | $16.00 |
| Saved Non–Continuing Expenses | $0.60 | ($4.80) |
| Actual Loss Sustain | | $11.20 |